1  JORDAN R. JAFFE, State Bar No. 254886
   (jjaffe@wsgr.com)
2  CATHERINE R. LACEY, State Bar No. 291591
   (clacey@wsgr.com)
3  WILSON SONSINI GOODRICH & ROSATI, P.C.
   One Market Plaza
4  Spear Tower, Suite 3300
   San Francisco, CA 94105
5  Telephone:    (415) 947-2000
   Facsimile:    (415) 947-2009
6
   JESSICA LONERGAN (*pro hac vice* forthcoming)
7  (jlonergan@wsgr.com)
   WILSON SONSINI GOODRICH & ROSATI, P.C.
8  1301 Avenue of the Americas, 40th Floor
   New York, NY  10019
9  Telephone:    (212) 999-5800
   Facsimile:    (866) 974-7329
10
   *Attorneys for Plaintiff Run The World Inc.*
11

12              UNITED STATES DISTRICT COURT

13            NORTHERN DISTRICT OF CALIFORNIA

14

15  RUN THE WORLD INC.,                    )   CASE NO.:
                                           )
16              Plaintiff,                 )   **COMPLAINT**
                                           )
17       v.                                )
                                           )   **(1) Violation of Computer Fraud and**
18  XUAN JIANG,                            )   **Abuse Act (18 U.S.C. § 1030 *et seq.*)**
                                           )
19              Defendant.                 )   **(2) Violation of California**
                                           )   **Comprehensive Computer Data**
20                                         )   **Access and Fraud Act (Cal. Pen. Code**
                                           )   **§§ 502 *et seq.*)**
21                                         )
                                           )   **(3) Breach of Contract**
22                                         )
                                           )   **(4) Breach of Fiduciary Duty**
23                                         )
                                           )   **(5) Trespass to Chattels**
24                                         )
                                           )   **(6) Conversion of Property**
25                                         )
                                           )   **JURY TRIAL DEMANDED**
26                                         )
                                           )
27  —————————————————————

28

COMPLAINT

Plaintiff Run The World Inc. ("RTW" or "Plaintiff"), complains and alleges against Defendant Xuan Jiang ("Ms. Jiang" or "Defendant"), as follows:

## NATURE OF THE ACTION

1.      This is an action to stop, and recover damages as compensation for, Defendant's sabotage of RTW's products and operations and failure to return RTW property in violation of (1) the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq*.; and (2) the California Comprehensive Computer Data Access and Fraud Act, Cal. Pen. Code §§ 502 *et seq*; and (3) in breach of her employment contract with RTW, (4) in breach of her fiduciary duties to RTW, (5) as trespass to chattels, and (6) as conversion.

## THE PARTIES

2.      Plaintiff Run The World Inc. is a corporation organized and existing under the laws of Delaware, with its headquarters located at 736 Arlington Road, Redwood City, California 94062.  RTW hosts virtual social gatherings, webinars, and conferences throughout the United States and abroad.

3.      Defendant Xuan Jiang is a former member of the board of directors and employee of Plaintiff RTW.  Upon information and belief, she resides in San Jose, California.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331, as it arises under the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 *et seq*.

5.      This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Plaintiff's state law claims under the California Comprehensive Computer Data Access and Fraud Act, Cal. Pen. Code §§ 502 *et seq*., for breach of contract, breach of fiduciary duty, trespass to chattels, and conversion under the common law of California because RTW's state law claims are so closely related to its federal claim that they form part of the same case and controversy under Article III of the United States Constitution.

6.      Venue is proper in the United States District Court for the Northern District of California pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS

### *RTW, Defendant Jiang's Role, and the RTW Domains*

7.      In or about 2019, RTW Founder and CEO Xiaoyin Qu was inspired by her mother's arduous experience travelling from Asia to Chicago for a medical conference to create an online venue for virtual events, including professional conferences, webinars, and social gatherings.  The products and services offered by RTW would later prove invaluable when the coronavirus (COVID-19) pandemic and response prevented many conferences and other professional events from occurring in person, and virtual events became the norm.

8.      In or about July 2019, Ms. Qu, together with Defendant Xuan Jiang, founded the company Plaintiff Run The World, Inc.  On or about July 10, 2019, Ms. Jiang entered a Restricted Stock Purchase Agreement with RTW to purchase founders' shares ("Purchase Agreement," attached hereto as Exhibit A).  In the Purchase Agreement, Ms. Jiang, as part of her consideration for the shares in RTW, "transfer[ed] and assign[ed] to the Company [RTW] (i) the business plan of the Company (the 'Business Plan') and (ii) any and all right, title and interest the Purchaser has in the Company's business and any Intellectual Property (as defined below) related to the Company's business, as currently conducted and as contemplated to be conducted pursuant to the Business Plan or otherwise."  Ex. A at 1.  Ms. Jiang further agreed "to take all actions reasonably requested by the Company to assist the Company in effecting the foregoing transfer [as described above] and in establishing, perfecting, defending, enforcing and protecting the Company's rights in any of the above transferred items."  *Id.*  "Intellectual Property" under the Purchase Agreement was defined to include, *inter alia*, "domain names, web addresses and web sites, and all rights therein and thereto."  *Id.*

9.      With the execution of the Purchase Agreement, Ms. Qu and Ms. Jiang became the two owners of RTW.  As a result, Ms. Jiang had a fiduciary relationship with RTW from on or

about July 10, 2019, until her termination from the board of directors of RTW on or about April 14, 2023.  Ms. Jiang has acknowledged she owed a fiduciary duty to RTW, including in emails, during her tenure on the board of the company.

10.     Ms. Jiang was the technical lead of RTW from its founding until her separation from RTW in or about April 2023.  She held the titles Director of Engineering and Chief Technical Officer during her time with RTW.

11.     As the technical lead of RTW, Ms. Jiang was responsible for obtaining online domains for RTW.  Domains are used to identify a location on the Internet, such as the web address for a website.  RTW required domains for the web address for its customer facing website, as well as for Internet locations used by both its customer-facing products and its internal developer and database tools.

12.     In or about September 2019, Ms. Jiang registered the domain "rtw.team" for RTW with the domain registrar GoDaddy.  The rtw.team domain would be used in connection with RTW's customer-facing website, https://www.runtheworld.today/; for addresses used by RTW's customer-facing products; and for addresses used by RTW internally for developer and database tools.  Ms. Jiang also obtained for RTW the domain "rtw.today" (collectively with "rtw.team," the "RTW Domains").

13.     Neither Ms. Jiang's co-founder at RTW, Ms. Qu, nor, on information and belief, anyone else at RTW, knew Ms. Jiang thought of the RTW Domains as her personal property, as she would contend much later.

14.     Since at least 2020, Ms. Jiang used a company credit card to pay bills for the GoDaddy account used to set up and maintain the RTW Domains.  Ms. Jiang also registered her RTW-issued email account, xuanjiang@runtheworld.today, as an email for the GoDaddy account that controlled the domains.  The GoDaddy account belonged to RTW at least from the registration of the RTW Domains, for which "all rights therein and thereto" had been assigned to RTW.

15.     The RTW Domains, and the websites, products, and tools that rely on the domains to function, are valuable to RTW.  RTW is a web-based business.  RTW clients hold virtual events through the customer-facing website.  When the domains used for website addresses are inaccessible, the website and customer-facing products cannot work.  Further, RTW's internal developer and database tools use addresses that incorporate internet domains, and they too do not function if they cannot connect to the appropriate domain.  RTW's entire business depended on access to the RTW Domains.

16.     Ms. Jiang was well aware that the rtw.team domain in particular was integral to RTW's business.  Ms. Jiang created a document for onboarding new engineers into RTW that listed "rtw.team" as the "keyword" in a particular tool and that listed specific addresses incorporating the "rtw.team" domain.  Moreover, Ms. Jiang referred to various internet addresses incorporating the "rtw.team" domain in her numerous work communications with RTW engineers, including in communications relating to onboarding.

17.     In or about October 2019, outside funding was sought for RTW, and in connection with the fundraising efforts, the founders, Ms. Qu and Ms. Jiang, signed additional documents formalizing their relationship with RTW.  On or about October 4, 2019, Ms. Jiang signed a letter agreement (the "Letter Agreement," attached hereto as Exhibit B) reaffirming her commitment in the July 10, 2019 Purchase Agreement that she had assigned to RTW "any and all right, title and interest [she] had in [RTW]'s business and any Intellectual Property related to [RTW]'s business, as currently conducted and as contemplated to be conducted pursuant to the Business Plan and otherwise."

18.     On or about October 14, 2019, Ms. Jiang also signed a formal offer letter for employment with RTW with the title "Director of Engineering" and an attached Proprietary Information and Inventions Agreement (the "Confidentiality Agreement," attached hereto with the offer letter as Exhibit C)  In the Confidentiality Agreement, Ms. Jiang agreed that RTW "shall own all right, title and interest (including patent rights, copyrights, trade secret rights, mask work rights, *sui generis* database rights and all other intellectual property rights of any sort

throughout the world) relating to any and all inventions (whether or not patentable), works of authorship, mask works, designs, know-how, ideas and information made or conceived or reduced to practice, in whole or in part, by [Ms. Jiang] during the term of [her] employment with [RTW] to and only to the fullest extent allowed by California Labor Code Section 2870 (which is attached as Appendix A) (collectively 'Inventions') and [she] will promptly disclose all Inventions to" RTW.

19.     Ms. Jiang also agreed in the Confidentiality Agreement that, in consideration for her employment at RTW, she would upon termination of her employment "promptly return to [RTW] all items containing or embodying Proprietary Information (including all copies), except that [she] may keep [her] personal copies of (i) [her] compensation records, (ii) materials distributed to shareholders generally and (iii) this Agreement." *Id.* ¶ 4.  Proprietary Information was defined to include "all Inventions and all other business, technical and financial information (including, without limitation, the identity of and information relating to customers or employees) [she] develop[s], learn[s] or obtain[s] during the term of [her] employment that relate to [RTW] or the business or demonstrably anticipated business of [RTW] or that are received by or for [RTW] in confidence." *Id.*

### Ms. Jiang's Departure from and Sabotage of RTW

20.     By at least in or around December 2022, Ms. Jiang began discussions with Ms. Qu about leaving RTW and potentially starting a new company.  Throughout December 2022 and most of January 2023, Ms. Jiang was less responsive to RTW business and communications than expected and than she had been in the past.  Ms. Jiang missed regularly scheduled meetings, did not respond to RTW's bookkeeper when prompted by Ms. Qu, and did not respond to various work-related messages from Ms. Qu.

21.     Around late January 2023, discussions between Ms. Qu and Ms. Jiang regarding Ms. Jiang potentially leaving the company resumed, and Ms. Jiang expressed that she was open to leaving RTW.  These conversations continued throughout February and March 2023.

22.     On or about March 31, 2023, as part of a discussion of a potential acquisition of RTW by another company, Ms. Qu asked Ms. Jiang via email to research how to transfer an RTW domain and website to the potential acquirer.  In response, Ms. Jiang did not claim that the domain, website, or GoDaddy account belonged to her or object to the idea of the domain being transferred to a potential acquirer.  Instead, Ms. Jiang replied via email that she would be "[h]appy to lead the technical investigation work" and asked for additional information regarding the potential acquisition.

23.     On or about April 3, 2023, Ms. Jiang, without the consent of RTW or any of her colleagues at RTW, sent an email to Plaintiff's funding company (attached hereto as Exhibit D) stating: "[A]fter much reflection and consideration, I made the difficult decision to step down as the tech co-founder of Run The World.  I am incredibly proud of everything that we have accomplished together, and I have no doubt that Run The World has a bright future ahead of it.  However, I have come to the conclusion that it is time for me to move on and pursue a new opportunity."

24.     Ms. Jiang further stated in her April 3 email that she was "disappointed that Run The World may not be able to fully capitalize on its potential without [her] continued involvement, [but she] remain[ed] committed to doing everything in [her] power to ensure a successful outcome for all parties involved."  She added that she believed "that Run The World has significant potential" and that "with the right leadership and support, it can continue to thrive and grow."

25.     Subsequently, on or about April 12, 2023, at approximately 3:21 PM Pacific time, RTW's counsel sent an email to Ms. Jiang confirming acceptance of her resignation and the separation of Ms. Jiang from RTW.  In response, by email at approximately 3:58 PM Pacific time the same day, Ms. Jiang claimed she did "not intend to resign from [her] position at Run The World" and threatened to sue RTW for discrimination.

26.     Less than 90 minutes later, at approximately 5:24 PM Pacific time, a device using a New York IP address attempted to log into RTW's intranet.  Plaintiff had no employees located

in New York at that time but, upon information and belief, Ms. Jiang's husband has at times lived in New York City.  Upon information and belief, the attempted access to Plaintiff's intranet was by or at the behest of Ms. Jiang.

27.     Just a few hours later, at approximately 8:53 PM Pacific time, Ms. Jiang sent another email to Plaintiff's counsel complaining that her "company accounts, including [her] email have been shut down without consulting" her and again threatening to sue RTW.

28.     On or about April 13, 2023, starting before 10:00 AM Pacific time, RTW experienced an outage of its customer-facing website, products, and internal coding and database tools.  RTW personnel pinpointed the outage as being caused by an issue with the rtw.today domain.

29.     Shortly after 12:00 AM Pacific time on or about April 14, 2023, Ms. Qu, the CEO of RTW, used the RTW email account previously assigned to Ms. Jiang, xuanjiang@runtheworld.today, to access the GoDaddy account through which the RTW Domains were purchased and managed.  Ms. Qu renewed the RTW Domains, and RTW engineers reconfigured the DNS settings and fixed the issue.  Ms. Qu also noticed that GoDaddy had recorded another device logging into the account approximately 7 hours earlier from near San Jose, California.  On information and belief, that access and changes to the rtw.today domain were by or at the behest of Ms. Jiang, who lives in San Jose, California.

30.     Later on or about April 14, 2023, before approximately 11:59 AM Pacific time, RTW received an email from GoDaddy at the RTW email address formerly assigned to Ms. Jiang stating that its account settings were updated.  No one at RTW had updated them around that time.  Around that time or shortly thereafter, RTW began experiencing another outage of its customer-facing website, products, and internal coding and database tools.  RTW received numerous customer messages regarding the website and products again being inaccessible.  On information and belief, this outage was also caused by or at the behest of Ms. Jiang.

31.     Shortly before 3:41 PM Pacific time on or about April 14, 2023, Ms. Jiang was removed from the board of directors of Run The World.  At approximately 5:14 PM Pacific time

the same day, Plaintiff's counsel sent an email to Ms. Jiang indicating that she had been formally removed from the board of RTW and attaching the "Action by Written Consent of the Stockholders" indicating as much.

32.     At approximately 5:37 PM Pacific time the same day, RTW received an email at xuanjiang@runtheworld.today, the email account previously assigned to Ms. Jiang, from the GoDaddy website hosting service indicating that both RTW Domains had been deleted or cancelled.  No one at RTW had deleted or cancelled the RTW Domains.  On information and belief, the domains were deleted or cancelled by or at the behest of Ms. Jiang for the purpose of sabotaging RTW's operations.

33.     As a result of Ms. Jiang's actions with respect to the RTW Domains and the GoDaddy account, RTW had to acquire another domain and re-map its products and internal tools using the new domain, which has taken considerable time and expense.  The primary customer-facing website and customer services were down for more than a week.  During that time, more than 700,000 RTW user accounts were inaccessible, causing harm to RTW's customers and damaging RTW's reputation, trust, and relationship with its customers.

34.     RTW received complaints from numerous customers.  One customer stated: "We are losing money daily.  This is a serious problem and is not good!"  Another customer stated: "It's hard to run a business with an unreliable platform."  Yet another customer stated: "I own a business and use Run the World to host webinars for my customers. I have an upcoming event on Monday and need to get this solved ASAP."  Still another customer requested a refund, stating "this is beyond frustrating" and noting that the refund was to "cover reimbursing participants and several missed sale attempts."  Another customer noted its "income loss, time spent in finding work arounds, developing events elsewhere, not being able to hold mixers which always have good attendance, have hurt us significantly" and asked "how [RTW] will address our complaints."

35.      RTW expects to pay numerous refunds to customers totaling at least in the tens of thousands of dollars.

*Defendant's Failure to Return Company Property*

36.     On or about April 18, 2023, RTW's counsel sent a letter to Ms. Jiang's counsel requesting that Ms. Jiang "return any and all Company property in her possession, including ceasing to misuse or rendering unavailable any of said property in her custody, possession or control" and noting her obligations to do so under the Confidentiality Agreement. *See* Ex. E at 1. The April 18 letter specifically advised that Ms. Jiang should "not delete or destroy anything relevant to the issues described herein, except as in cooperation with" RTW.

37.     On or about April 20, 2023, Ms. Jiang returned her RTW laptop and charger to RTW, but Ms. Jiang had reset the laptop, wiping it of all user information in contravention of Plaintiff's express request not to delete or destroy relevant information and Ms. Jiang's obligation under the Confidentiality Agreement to return RTW information.  On information and belief, the laptop contained RTW information prior to being wiped by Ms. Jiang.

38.     On or about April 27, 2023, RTW's counsel sent an email to Ms. Jiang's counsel, noting the improper deletion of data from the laptop, and demanding that Ms. Jiang return other company property believed to be in her possession, including documents relating to RTW's Chinese trademarks, documents relating to RTW's Delaware corporate registration, and RTW credit cards and bank account information.  The email further demanded that Ms. Jiang return the RTW Domains by giving RTW access to the GoDaddy account used to register the RTW Domains.

39.     In an email response, on or about May 1, 2023, Ms. Jiang's lawyer claimed that Ms. Jiang no longer had access to documents relating to the Chinese trademark registrations and Delaware corporate registration, company credit cards, and bank account information, and that Ms. Jiang had never possessed company checkbooks.  Ms. Jiang's lawyer stated that it was the lawyer's understanding that the RTW credit card had been deactivated.  Ms. Jiang's lawyer also contended that the GoDaddy account was Ms. Jiang's "personal account" and did not otherwise address the request for the return of the RTW Domains.

1    40.    The physical RTW credit cards issued to Ms. Jiang from American Express and

2    Brex were not returned.  The American Express card was cancelled, on information and belief,

3    with an unpaid balance by Ms. Jiang; and the Brex card was later canceled by Ms. Qu.

4    41.    In addition, hard-copy documents relating to RTW's Chinese trademark

5    registrations, including the original copies of four registration certificates, had been sent to Ms.

6    Jiang by RTW's counsel during Ms. Jiang's employment at RTW.  Ms. Jiang has not returned

7    these documents to RTW.  On information and belief, Ms. Jiang has retained, lost, or destroyed

8    these documents.

9    42.    Documents relating to RTW's corporate registration in Delaware and corporate

10    financing were similarly sent to Ms. Jiang's home.  Ms. Jiang has not returned these documents

11    to RTW.  On information and belief, Ms. Jiang has retained, lost, or destroyed these documents.

12    43.    Ms. Jiang has failed to return any of these materials to RTW.  She has further

13    failed to return the GoDaddy account used to register the RTW Domains.  She has never

14    provided the RTW information that was deleted from her laptop.

15    44.    On or about June 1, 2023, RTW's counsel sent a letter to Ms. Jiang's counsel

16    reiterating RTW's complaints regarding her failure to return RTW property and briefly setting

17    out Ms. Xuan's apparent misconduct with respect to the RTW Domains (attached hereto as

18    Exhibit F).

19    45.    In a responsive letter dated on or about June 12, 2023, Ms. Jiang's counsel did not

20    deny that Ms. Jiang had removed the RTW Domains and instead appeared to concede as much

21    by referring to "Ms. Jiang's removal of the domains."  Ms. Jiang's counsel argued that, despite

22    all of the agreements discussed above and paying for the domains with RTW funds, Ms. Jiang

23    "maintains the rights to" the RTW Domains.

### FIRST CAUSE OF ACTION

(Violation of Computer Fraud and Abuse Act, 18 U.S.C. § 1030)

26    46.    RTW re-alleges and incorporates by reference each and every allegation

27    contained in paragraphs 1 through 45 of this Complaint.

28

COMPLAINT                                               -10-

47.     RTW's computers, including servers hosting RTW data, and GoDaddy's computers associated with the RTW Domains are "protected computers" within the meaning of 18 U.S.C. §§ 1030(e)(1), (e)(2)(B), including, but not limited to, because they are connected to the Internet and used in interstate commerce.

48.     Defendant intentionally accessed one or more of these protected computers without authorization and, as a result of such conduct, intentionally or recklessly caused damage in violation of 18 U.S.C. § 1030(a)(5)(B), including, but not limited to, by accessing the GoDaddy account managing the RTW Domains after her termination as an employee and deleting, cancelling, and/or otherwise rendering inoperable the RTW Domains and, in turn, disabling RTW's customer-facing website, customer-facing products, and internal tools.

49.     Defendant intentionally accessed RTW's protected computers without authorization and, as a result of such conduct, caused damage and loss in violation of 18 U.S.C. § 1030(a)(5)(C), including, but not limited to, by preventing RTW's customers from using its website and products during the outages, harming RTW's customer trust and relationships, and requiring RTW to expend time and money on customer refunds and restoring service.

50.     Defendant's impairment of RTW's website, other web-based services, internal tools, and the domains constitutes "damage" within the meaning of 18 U.S.C. § 1030(e)(8).

51.     RTW spent significant time and money reconnecting RTW's websites and products with its users and issuing refunds to customers.  Moreover, RTW's relationships with its customers have been harmed by Defendant's unauthorized access, all of which constitutes "loss" within the meaning of 18 U.S.C. § 1030(e)(11).

52.     Defendant's unauthorized access described herein has cost Plaintiff well in excess of $5,000.00 in economic damages.

SECOND CAUSE OF ACTION

(Violation of Comprehensive Computer Data Access and Fraud Act, California Penal Code §§ 502, *et seq.*)

53.     RTW re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 52 of this Complaint.

54.     RTW company websites and products consist of, and are stored on, RTW's data, computers, computer networks, computer programs and software, computer services, and computer systems within the meaning of California Penal Code §§ 502(b)(2)-(5), (b)(8).

55.     Defendant knowingly accessed and without permission intentionally disrupted and caused the disruption of RTW's computer services and denied and caused the denial of computer services to RTW and RTW's authorized users, in violation of California Penal Code § 502(c)(5).

56.     Defendant's access and modification of RTW's computers, computer systems, and computer networks, as described above, harmed RTW in an amount to be proven at trial.

57.     RTW may bring this action against Defendant under California Penal Code § 502(e) because RTW is the owner and lessee of the computers, computer systems, computer networks, computer programs, and data and has suffered damage and loss by reason of Defendant's violations.  RTW is also entitled to recover reasonable attorneys' fees under California Penal Code § 502(e).

THIRD CAUSE OF ACTION

(Breach of Contract under California Law)

58.     RTW re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 57 of this Complaint.

59.     As a condition of her employment with RTW, Defendant signed and agreed to abide by the terms of the Confidentiality Agreement, Exhibit C, which required Defendant to, among other things, promptly return to RTW all items containing and embodying RTW's proprietary information (including any copies).

60.     RTW fully complied with and fulfilled its obligation under the Confidentiality Agreement by, among other things, employing Defendant for several years.

61.     After her employment terminated, Defendant breached the Confidentiality Agreement by not promptly returning all RTW property, including confidential and proprietary information from Defendant's laptop, the RTW Domains, the RTW credit cards, and, on information and belief, documents relating to RTW's Chinese trademarks, RTW's corporate registration in Delaware, and information regarding RTW's financing.

62.     RTW has sustained and will sustain damages as a direct and proximate result of Defendant's breach of the Confidentiality Agreement.  At a minimum, RTW would have to pay fees to replace RTW's Chinese trademark certificates and corporate registration documents.

**FOURTH CAUSE OF ACTION**

(Breach of Fiduciary Duty under California Law)

63.     RTW re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 62 of this Complaint.

64.     Defendant owed a fiduciary duty to RTW from at least on or about July 10, 2019, when she entered the Purchase Agreement as a member of its Board of Directors.  In addition, Defendant was an employee of RTW from at least on or about October 14, 2019, until her termination in or about April 2023.

65.     Defendant breached her fiduciary duty by (1) registering the RTW Domains to a GoDaddy account she would later claim was a personal account and failing to transfer control of the account and the RTW Domains to RTW, even after her termination as an employee; (2) using her access to the RTW Domains and GoDaddy account to disrupt RTW's service to its customers and internal developer and database tools; and (3) failing to return other RTW information and documents to RTW.

66.     Defendant's breach of her duty proximately caused RTW and its customers harm by disrupting RTW's service to its customers, requiring RTW to pay refunds, and harming RTW's relationship with its customers.

1
2

<u>**FIFTH CAUSE OF ACTION**</u>

(Trespass to Chattels under California Law)

3       67.     RTW re-alleges and incorporates by reference each and every allegation

4   contained in paragraphs 1 through 66 of this Complaint.

5       68.     RTW owned, possessed, and had a right to possess the RTW Domains, rtw.team

6   and rtw.today.  RTW also owned, possessed, and had a right to possess all of its property in Ms.

7   Jiang's possession, custody or control, including confidential and proprietary information on Ms.

8   Jiang's laptop at the time of her termination, the RTW credit cards, RTW's documents relating to

9   RTW's Chinese trademarks and RTW's corporate registration in Delaware, and information

10  regarding RTW's financing.

11      69.     Defendant, by deleting, cancelling, and otherwise rendering inoperable the RTW

12  Domains, has intentionally and without permission disrupted and interfered with the use and

13  possession of the RTW Domains.  In addition, by intentionally deleting the information on her

14  laptop, Ms. Jiang has intentionally and without permission disrupted and interfered with the use

15  and possession of that information.  Further, on information and belief, by intentionally

16  destroying, retaining, or otherwise disposing of the RTW credit cards, RTW's documents

17  relating to RTW's Chinese trademarks and RTW's corporate registration in Delaware, and

18  information regarding RTW's financing, Ms. Jiang has intentionally and without permission

19  disrupted and interfered with RTW's use and possession of those documents and accounts.

20      70.     RTW was harmed by Defendant's conduct, as her interference with the RTW

21  Domains caused an outage of RTW's customer-facing website and products as well as internal

22  tools by RTW and its customers.  As a result, none of RTW's customers were able to access

23  RTW's services during the outages.  Defendant's intentional conduct has harmed RTW's

24  reputation and resulted in loss of goodwill in the United States and worldwide.  The loss of

25  RTW's hard-copy documents and information resulting from Ms. Jiang's conduct has also

26  resulted in harm to RTW.  At a minimum, RTW would have to pay fees to replace RTW's

27  Chinese trademark certificates and corporate registration documents.

28

### SIXTH CAUSE OF ACTION

(Conversion under California Law)

71.     RTW re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 70 of this Complaint.

72.     RTW owned, possessed, and had a right to possess the RTW Domains, rtw.team and rtw.today.  RTW also owned, possessed, and had a right to possess all of its property in Ms. Jiang's possession, custody or control, including confidential and proprietary information on Ms. Jiang's laptop at the time of her termination, the RTW credit cards, and, on information and belief, RTW's documents relating to RTW's Chinese trademarks and RTW's corporate registration in Delaware, and information regarding RTW's financing.

73.     Defendant has substantially interfered with RTW's property, by knowingly and intentionally, and without RTW's consent, preventing RTW from having access to the RTW Domains, destroying the RTW Domains, and refusing to return the RTW Domains after RTW demanded their return.  Further, Defendant has also substantially interfered with RTW's information that was contained on her laptop at the time of her termination and, on information and belief, RTW's documents relating to RTW's Chinese trademarks and RTW's corporate registration in Delaware, and information regarding RTW's financing.

74.     RTW was harmed by Defendant's conduct, as her interference with the RTW Domains caused an outage of RTW's customer-facing website and products as well as internal tools by RTW and its customers.  As a result, none of RTW's customers were able to access RTW's services during the outages.  Defendant's intentional conduct has harmed RTW's reputation and resulted in loss of goodwill in the United States and worldwide.  The loss of RTW's hard-copy documents and information resulting from Ms. Jiang's conduct has also resulted in harm to RTW.  At a minimum, RTW would have to pay fees to replace RTW's Chinese trademark certificates and corporate registration documents.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff RTW prays for judgment in its favor and against Defendant Xuan Jiang, inclusive as follows:

1.    Granting temporary, preliminary, and permanent injunctive relief against Defendant, and any persons in active concert or participation with her, enjoining Defendant from: (i) intentionally disrupting or preventing RTW and authorized users of RTW's website and products from accessing RTW's website, products, and internal tools; (ii) intentionally and without permission, impairing the integrity, availability, and condition of RTW's computers and web-based services, in violation of California's common law prohibiting trespass to chattel;

2.    Requiring Defendant to return to RTW: (i) control of the RTW domains; (ii) (ii) all other RTW property or information in her possession, custody, and control, including, but not limited to, any (1) documents regarding Plaintiff's Trademark Registration, including "The People's Republic of China Certificate of Trademark Registration, Class 9: Face recognition apparatus," "The People's Republic of China Certificate of Trademark Registration, Class 36: Processing of credit card payments; electronic funds transfer; organization of monetary collections; e-wallet payment services; bill payment services provided through a website; crowdfunding; art appraisal," "The People's Republic of China Certificate of Trademark Registration, Class 42: Technological research; research and development of new products for others," "The People's Republic of China Certificate of Trademark Registration, Class 45: Computer Software licensing; licensing of intellectual property;" (2) documents regarding Plaintiff's company registration; and (3) documents related to Plaintiff's corporate

1    finance, including but not limited to, all current and expired company

2    credit cards and company check books;

3    3.    Awarding compensatory damages in an amount to be determined at trial;

4    4.    Awarding exemplary damages in an amount to be determined at trial;

5    5.    Awarding interest at the maximum legal rate on all sums awarded;

6    6.    Awarding reasonable attorneys' fees as permitted by law;

7    7.    Awarding all costs of suit herein; and

8    8.    Awarding such other and further relief as the Court deems just and proper.

9    **JURY DEMAND**

10    Plaintiff RTW demands a jury trial on all triable issues.

11

12    Dated:  June 23, 2023                    WILSON SONSINI GOODRICH &
                                              ROSATI
13                                            Professional Corporation

14

15                                            By: */s/ Jordan R. Jaffe*
                                              Jordan R. Jaffe (State Bar No. 254886)
16
                                              *Attorneys for Plaintiff Run The World Inc.*
17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT                                    -17-

# EXHIBIT A

# RUN THE WORLD, INC.

## RESTRICTED STOCK PURCHASE AGREEMENT

This Restricted Stock Purchase Agreement (the "***Agreement***") is made as of July 10, 2019 by and between Run The World, Inc., a Delaware corporation (the "***Company***"), and Xuan Jiang (the "***Purchaser***").

In consideration of the mutual covenants and representations set forth below, the Company and the Purchaser agree as follows:

1.      **Purchase and Sale of the Shares.** Subject to the terms and conditions of this Agreement, the Company agrees to sell to the Purchaser and the Purchaser agrees to purchase from the Company on the Closing (as defined below) 4,000,000 shares of the Company's Common Stock, par value $0.0001 per share (the "***Shares***"), at a price of $0.0001 per share (the "***Purchase Price***"), for an aggregate purchase price of $400.00. As part of the consideration for the Company's agreement to sell the Shares, the Purchaser hereby transfers and assigns to the Company (i) the business plan of the Company (the "***Business Plan***") and (ii) any and all right, title and interest the Purchaser has in the Company's business and any Intellectual Property (as defined below) related to the Company's business, as currently conducted and as contemplated to be conducted pursuant to the Business Plan or otherwise. For purposes hereof, "***Intellectual Property***" means: (i) United States and foreign patents, trademarks, copyrights and mask works, registrations and applications therefor, and rights granted upon any reissue, division, continuation or continuation-in-part thereof, (ii) trade secret rights arising out of the laws of any and all jurisdictions, (iii) ideas, inventions, concepts, technology, software, methods, processes, drawings, illustrations, writings, know-how, show-how, trade names, domain names, web addresses and web sites, and all rights therein and thereto, (iv) any other intellectual property rights, whether or not registrable, and (v) licenses in or to any of the foregoing. Further, the Purchaser agrees to take all actions reasonably requested by the Company to assist the Company in effecting the foregoing transfer and in establishing, perfecting, defending, enforcing and protecting the Company's rights in any of the above transferred items, including without limitation assisting in the prosecution of any patent applications included in or based upon the Intellectual Property.

2.      **Closing.** The purchase and sale of the Shares shall occur at a closing (the "***Closing***") to be held on the date first set forth above, or at any other time mutually agreed upon by the Company and the Purchaser. The Closing will take place at the principal office of the Company or at such other place as shall be designated by the Company. At the Closing, the Purchaser shall deliver the aggregate Purchase Price set forth above to the Company by wire transfer, check or any other method of payment permissible under applicable law and approved by the Company's board of directors (or any combination of such methods of payment), and the Company will issue, as promptly thereafter as practicable, a stock certificate registered in the name of the Purchaser, or a notice of issuance of uncertificated stock, as applicable, reflecting the Shares.

3.      **Repurchase Option.**

A.      ***Option.*** In the event the Purchaser ceases to be an employee, consultant, advisor, officer or director of the Company (a "***Service Provider***") for any or no reason, including, without limitation, by reason of the Purchaser's death or disability (as defined in Section 22(e)(3) of the Internal Revenue Code of 1986, as amended (the "***Code***"), "***Disability***"), resignation or involuntary termination, the Company shall, from such time (as determined by the Company in its discretion), have an irrevocable, exclusive option to repurchase (the "***Repurchase Option***") any Shares that have not yet been released from the Repurchase Option (the "***Unreleased Shares***"), at a price per share equal to the lesser of (x) the

fair market value of the shares at the time the Repurchase Option is exercised, as determined by the Company's board of directors and (y) the Purchase Price (the "**Repurchase Price**"). The Company may exercise its Repurchase Option as to any or all of the Unreleased Shares at any time after the Purchaser ceases to be a Service Provider; *provided, however,* that without requirement of further action on the part of either party hereto, the Repurchase Option shall be deemed to have been automatically exercised as to all Unreleased Shares at 5:00 p.m. (Pacific time) as of the date that is 60 days following the date the Purchaser ceases to be a Service Provider, unless the Company declines in writing to exercise its Repurchase Option prior to such time.

B.      *Exercise.* If the Company decides not to exercise its Repurchase Option, it shall notify the Purchaser in writing within 60 days of the date the Purchaser ceases to be a Service Provider. If the Repurchase Option is exercised or deemed exercised, within 90 days of the date the Purchaser ceases to be a Service Provider, the Company shall deliver payment to the Purchaser, with a copy to the Escrow Agent (as defined in **Section 8** hereof), by any of the following methods, in the Company's sole discretion: (i) delivering to the Purchaser or the Purchaser's executor a check in the amount of the aggregate Repurchase Price, (ii) canceling an amount of the Purchaser's indebtedness to the Company equal to the aggregate Repurchase Price or (iii) any combination of (i) and (ii) such that the combined payment and cancellation of indebtedness equals the aggregate Repurchase Price.

C.      *Rights upon Exercise.* In the event that the Repurchase Option is exercised or deemed exercised, the sole right and remedy of the Purchaser thereafter shall be to receive the Repurchase Price, and in no case shall the Purchaser have any claim of ownership as to any of the Unreleased Shares.

D.      *Assignability.* The Company in its sole discretion may assign all or part of the Repurchase Option to one or more employees, officers, directors or stockholders of the Company or other persons or organizations.

4.      **Release of Shares from Repurchase Option; Vesting.**

A.      *Vesting.* So long as the Purchaser's continuous status as a Service Provider has not yet terminated in each such instance, (i) twenty-five percent (25%) of the total number of Shares shall be released from the Repurchase Option on the one-year anniversary of May 15, 2019, and (ii) thereafter, the remaining seventy-five percent (75%) of the total number of Shares shall be released from the Repurchase Option in equal monthly installments over the next thirty-six (36) months on the corresponding day of each relevant month (or if there is no corresponding day in any such month, on the last day of such month).

B.      *Acceleration upon Termination after a Change of Control.* In the event that the Purchaser's continuous status as a Service Provider is terminated by the Company without Cause (as defined below) after a Change of Control (as defined below), other than as a result of death or Disability, 100% of the total number of Shares that have not been released from the Repurchase Option shall be immediately released from the Repurchase Option, *provided* that such release be conditioned upon the Purchaser executing and not revoking a release of claims in a form reasonably satisfactory to the Company.

C.      *"Change of Control" Definition.* For purposes of this Agreement, a "**Change of Control**" means either:

(1)      the acquisition of the Company by another entity by means of any transaction or series of related transactions (including, without limitation, any reorganization, merger or consolidation or stock transfer, but excluding any such transaction effected primarily for the purpose of

2

changing the domicile of the Company), unless the Company's stockholders of record immediately prior to such transaction or series of related transactions hold, immediately after such transaction or series of related transactions, at least 50% of the voting power of the surviving or acquiring entity (*provided* that the sale by the Company of its securities for the purposes of raising additional funds shall not constitute a Change of Control hereunder); or

(2)     a sale of all or substantially all of the assets of the Company.

D.     ***"Cause" Definition.*** For purposes of this Agreement, "***Cause***" means (i) the Purchaser's failure to substantially perform his or her material duties and obligations as a Service Provider (for reasons other than death or Disability), which failure is not cured to the sole and reasonable satisfaction of the Company; (ii) the Purchaser's failure or refusal to comply with the policies, standards and regulations established by the Company from time to time, which failure is not cured to the sole and reasonable satisfaction of the Company; (iii) any act of personal dishonesty, moral turpitude, fraud, embezzlement, misrepresentation, or other unlawful act committed by the Purchaser that results in harm to the Company or its affiliates, including financial or reputational, which harm shall be determined in the Company's sole and reasonable discretion; (iv) the Purchaser's violation of a federal or state law or regulation applicable to the business of the Company or its affiliates; (v) the Purchaser being convicted of, or entering a plea of *nolo contendere* or guilty to, a felony under the laws of the United States or its equivalent in the jurisdiction in which the act that constituted the felony occurred; (vi) the Purchaser's material breach of the terms of this Agreement or any other agreement between the Purchaser and the Company (or any affiliate of the Company); or (vii) the Company's economic duress or necessity, as determined by the Company in its sole and reasonable discretion. With respect to (i) and (ii) above only, the Purchaser shall have ten days to cure following written notice of the Purchaser's failure or refusal to perform or comply, *provided* that whether the failure is curable shall be within the Company's sole and reasonable discretion.

E.     ***Delivery of Released Shares.*** Subject to the provisions of **Section 8**, the Shares that have been released from the Company's Repurchase Option shall be delivered to the Purchaser at the Purchaser's request.

5.     **Limitation on Payments.**

A.     ***Payments Limitation.*** In the event that the severance and other benefits provided for in this Agreement or otherwise payable to the Purchaser (i) constitute "***parachute payments***" within the meaning of Section 280G of the Code and (ii) would be subject to the excise tax imposed by Section 4999 of the Code (the "***Excise Tax***"), then the Purchaser's benefits under this Agreement shall be either:

(1)     delivered in full, or

(2)     delivered as to such lesser extent which would result in no portion of such benefits being subject to the Excise Tax,

whichever of the foregoing amounts, taking into account the applicable federal, state and local income taxes and the Excise Tax, results in the receipt by the Purchaser on an after-tax basis, of the greatest amount of benefits, notwithstanding that all or some portion of such benefits may be taxable under Section 4999 of the Code. Any reduction in payments and/or benefits required by this **Section 5** will occur in the following order: (1) reduction of cash payments; (2) reduction of vesting acceleration of equity awards; and (3) reduction of other benefits paid or provided to Purchaser. In the event that acceleration of vesting of equity awards is to be reduced, such acceleration of vesting will be cancelled in

the reverse order of the date of grant for Purchaser's equity awards. If two or more equity awards are granted on the same date, each award will be reduced on a *pro-rata* basis. In no event will Purchaser exercise any discretion with respect to the ordering of any reductions of payments or benefits under this **Section 5**.

B.   ***Determination.*** Unless the Company and the Purchaser otherwise agree in writing, any determination required under this **Section 5** shall be made in writing by the Company's independent public accountants or a national "Big Four" accounting firm selected by the Company (the "***Accountants***"), whose determination shall be conclusive and binding upon the Purchaser and the Company for all purposes. For purposes of making the calculations required by this **Section 5**, the Accountants may make reasonable assumptions and approximations concerning applicable taxes and may rely on reasonable, good faith interpretations concerning the application of Section 280G and 4999 of the Code. The Company and the Purchaser shall furnish to the Accountants such information and documents as the Accountants may reasonably request in order to make a determination under this **Section 5**. The Company shall bear all costs the Accountants may reasonably incur in connection with any calculations contemplated by this **Section 5**.

6.   **Restrictions on Transfer.**

A.   ***Investment Representations and Legend Requirements.*** The Purchaser hereby makes the investment representations listed on Exhibit A to the Company as of the date of this Agreement and as of the date of the Closing, and agrees that such representations are incorporated into this Agreement by this reference, such that the Company may rely on them in issuing the Shares and for any other lawful purpose. The Purchaser understands and agrees that the Company shall cause the legends set forth below, or substantially equivalent legends, to be placed upon any certificate(s) evidencing ownership of the Shares (or upon a notice of issuance of uncertificated stock, as applicable), together with any other legends that may be required by the Company or by applicable state or federal securities laws:

THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "***ACT***") AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED UNLESS AND UNTIL REGISTERED UNDER THE ACT OR, IN THE OPINION OF COUNSEL SATISFACTORY TO THE ISSUER OF THESE SECURITIES, SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION OTHERWISE COMPLIES WITH THE ACT.

THE SHARES REPRESENTED HEREBY ARE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER, A RIGHT OF FIRST REFUSAL, A LOCK-UP PERIOD IN THE EVENT OF A PUBLIC OFFERING AND A REPURCHASE OPTION HELD BY THE COMPANY OR ITS ASSIGNEE(S) AS SET FORTH IN THE RESTRICTED STOCK PURCHASE AGREEMENT BETWEEN THE COMPANY AND THE ORIGINAL HOLDER OF THESE SHARES, A COPY OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE COMPANY. SUCH TRANSFER RESTRICTIONS, RIGHT OF FIRST REFUSAL, LOCK-UP PERIOD AND REPURCHASE OPTION ARE BINDING ON TRANSFEREES OF THESE SHARES.

B.   ***Stop-Transfer Notices.*** The Purchaser agrees that to ensure compliance with the restrictions referred to herein or any restrictions in the bylaws of the Company, the Company may issue appropriate "stop transfer" instructions to its transfer agent, if any, and that, if the Company transfers its own securities, it may make appropriate notations to the same effect in its own records.

C.       ***Refusal to Transfer.*** The Company shall not be required (i) to transfer on its books any Shares that have been sold or otherwise transferred in violation of any of the provisions of this Agreement or any applicable provisions of the bylaws of the Company or (ii) to treat as owner of such Shares or to accord the right to vote or pay dividends to any purchaser or other transferee to whom such Shares shall have been so transferred.

D.       ***Lock-Up Period.*** The Purchaser hereby agrees that the Purchaser shall not sell, offer, pledge, contract to sell, grant any option or contract to purchase, purchase any option or contract to sell, grant any right or warrant to purchase, lend or otherwise transfer or encumber, directly or indirectly, any Shares or other securities of the Company, nor shall the Purchaser enter into any swap, hedging or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of any Shares or other securities of the Company, during the period from the filing of the first registration statement of the Company filed under the Securities Act of 1933, as amended (the "***Securities Act***"), that includes securities to be sold on behalf of the Company to the public in an underwritten public offering under the Securities Act through the end of the 180-day period following the effective date of such registration statement (or such other period as may be requested by the Company or the underwriters to accommodate regulatory restrictions on (i) the publication or other distribution of research reports and (ii) analyst recommendations and opinions, including, but not limited to, the restrictions contained in NYSE Rule 472(f)(4), or any successor provisions or amendments thereto). The obligations described in this section shall not apply to a registration relating solely to employee benefit plans on Form S-l or Form S-8 or similar forms that may be promulgated in the future, or a registration relating solely to a transaction on Form S-4 or similar forms that may be promulgated in the future. The Purchaser further agrees, if so requested by the Company or any representative of its underwriters, to enter into such underwriter's standard form of "lock-up" or "market-standoff" agreement in a form satisfactory to the Company and such underwriter. The Company may impose stop-transfer instructions with respect to securities subject to the foregoing restrictions until the end of any such restriction period.

E.       ***Unreleased Shares.*** No Unreleased Shares subject to the Repurchase Option contained in **Section 3** of this Agreement, nor any beneficial interest in such Shares, shall be sold, gifted, transferred, encumbered or otherwise disposed of in any way (whether by operation of law or otherwise) by the Purchaser, other than as expressly permitted or required by **Section 3**.

F.       ***Released Shares.*** No Shares purchased pursuant to this Agreement, nor any beneficial interest in such Shares, shall be sold, gifted, transferred, encumbered or otherwise disposed of in any way (whether by operation of law or otherwise) by the Purchaser or any subsequent transferee, other than in compliance with the Company's right of first refusal provisions contained in **Section 7** of this Agreement and any applicable restrictions in the bylaws of the Company.

G.       ***No Transfers to Bad Actors.*** The Purchaser agrees not to sell, assign, transfer, pledge, encumber or otherwise dispose of any securities of the Company, or any beneficial interest therein, to any person (other than the Company) unless and until the proposed transferee confirms to the reasonable satisfaction of the Company that neither the proposed transferee nor any of its directors, executive officers, other officers that may serve as a director or officer of any company in which it invests, general partners or managing members nor any person that would be deemed a beneficial owner of those securities (in accordance with Rule 506(d) of the Securities Act) is subject to any of the "bad actor" disqualifications described in Rule 506(d)(1)(i) through (viii) under the Securities Act ("***Bad Actor Disqualifications***"), except as set forth in Rule 506(d)(2)(ii) or (iii) or (d)(3) under the Securities Act and disclosed, reasonably in advance of the transfer, in writing in reasonable detail to the Company. The Purchaser will promptly notify the Company in writing if the Purchaser or, to the Purchaser's knowledge, any person specified in Rule 506(d)(1) under the Securities Act becomes subject to any Bad Actor Disqualification.

H.     ***Restrictions Binding on Transferees.*** All transferees of Shares or any interest therein shall receive and hold such Shares or interest subject to all of the provisions of this Agreement and any applicable restrictions in the bylaws of the Company, and there shall be no further transfer of such Shares except in accordance with the terms of this Agreement and any applicable restrictions in the bylaws of the Company.

7.     **Company's Right of First Refusal.** Subject to any additional share transfer restrictions in the bylaws of the Company, before any Shares acquired by the Purchaser pursuant to this Agreement (or any beneficial interest in such Shares) may be sold, gifted, transferred, encumbered or otherwise disposed of in any way (whether by operation of law or otherwise) by the Purchaser or any subsequent transferee (each a "***Holder***"), such Holder must first offer such Shares or beneficial interest to the Company and/or its assignee(s) as follows:

A.     ***Notice of Proposed Transfer.*** The Holder shall deliver to the Company a written notice stating: (i) the Holder's *bona fide* intention to sell or otherwise transfer the Shares; (ii) the name of each proposed transferee; (iii) the number of Shares to be transferred to each proposed transferee; (iv) the *bona fide* cash price or other consideration for which the Holder proposes to transfer the Shares; and (v) that by delivering the notice, the Holder offers all such Shares to the Company and/or its assignee(s) pursuant to this section and, subject to **Section 7.C**, on the same terms described in the notice.

B.     ***Exercise of Right of First Refusal.*** At any time within 30 days after receipt of the Holder's notice, the Company and/or its assignee(s) may, by giving written notice to the Holder, elect to purchase all, but not less than all, of the Shares proposed to be transferred to any one or more of the proposed transferees, at the purchase price determined in accordance with **Section 7.C**.

C.     ***Purchase Price.*** The purchase price for the Shares purchased by the Company and/or its assignee(s) under this section shall be the price listed in the Holder's notice; *provided* that if the price listed in the Holder's notice consists of no legal consideration (as, for example, in the case of a transfer by gift), the purchase price shall be the fair market value of the Shares as determined by the board of directors of the Company in its sole discretion. If the price listed in the Holder's notice includes consideration other than cash, the cash equivalent value of the non-cash consideration shall be determined by the board of directors of the Company in its sole discretion.

D.     ***Payment.*** Payment of the purchase price shall be made, at the option of the Company and/or its assignee(s), in cash (or by check), by cancellation of all or a portion of any outstanding indebtedness of the Holder to the Company and/or its assignee(s), or by any combination thereof within 30 days after receipt by the Company of the Holder's notice (or at such later date as is called for by such notice).

E.     ***Holder's Right to Transfer.*** If all of the Shares proposed in the notice to be transferred to a given proposed transferee are not purchased by the Company and/or its assignee(s) as provided in this section, then the Holder may sell or otherwise transfer such Shares to that proposed transferee; *provided* that: (i) the transfer is made only on the terms provided for in the notice, with the exception of the purchase price, which may be either the price listed in the notice or any higher price; (ii) such transfer is consummated within 60 days after the date the notice is delivered to the Company; (iii) the transfer is effected in accordance with any applicable securities laws, and if requested by the Company, the Holder shall have delivered an opinion of counsel acceptable to the Company to that effect; (iv) prior to the transfer, the proposed transferee confirms to the reasonable satisfaction of the Company that neither the proposed transferee nor any of its directors, executive officers, other officers that may serve as a director or officer of any company in which it invests, general partners or managing members nor any person that would be deemed a beneficial owner of those Shares (in accordance with Rule 506(d)

of the Securities Act) is subject to any Bad Actor Disqualification, except as set forth in Rule 506(d)(2)(ii) or (iii) or (d)(3) under the Securities Act and disclosed, reasonably in advance of the transfer, in writing in reasonable detail to the Company; and (v) the proposed transferee agrees in writing to receive and hold the Shares so transferred subject to all of the provisions of this Agreement, including but not limited to this section, and any transfer restrictions in the bylaws of the Company, and there shall be no further transfer of such Shares except in accordance with the terms of this section and the bylaws of the Company. If any Shares described in a notice are not transferred to the proposed transferee within the period provided above, then before any such Shares may be transferred, a new notice shall be given to the Company, and the Company and/or its assignees shall again be offered the right of first refusal described in this section.

F.    ***Involuntary Transfers.*** Subject to the other provisions of this **Section 7**, in the event, at any time after the date of this Agreement, of any transfer by operation of law or other involuntary transfer (including, but not limited to, transfers by operation of law or other involuntary transfers in connection with a divorce, dissolution, legal separation or annulment) of all or a portion of the Shares by the record holder thereof that does not occur in accordance with the other provisions of this **Section 7**, the Company shall have the right to purchase all of the Shares transferred at the greater of the purchase price paid by Purchaser pursuant to this Agreement or the fair market value of the Shares on the date of transfer (as determined by the board of directors of the Company). Upon such a transfer, the persons transferring or acquiring the Shares shall promptly notify the Secretary of the Company in writing of such transfer. The right to purchase such Shares shall be provided to the Company for a period of 30 days following receipt by the Company of written notice of the transfer.

G.    ***Exception for Certain Family Transfers.*** Notwithstanding anything to the contrary contained elsewhere in this **Section 7**, the transfer of any or all of the Shares during the Holder's lifetime (except in connection with a divorce, dissolution, legal separation or annulment), or on the Holder's death by will or intestacy, to the Holder's spouse, child, father, mother, brother, sister, father-in-law, mother-in-law, brother-in-law, sister-in-law, grandfather, grandmother, grandchild, cousin, aunt, uncle, niece, nephew, stepchild, or to a trust or other similar estate planning vehicle for the benefit of the Holder or any such person, shall be exempt from the provisions of this **Section 7**; *provided* that, in each such case, the transferee agrees in writing to receive and hold the Shares so transferred subject to all of the provisions of this Agreement, including but not limited to this **Section 7**, and any transfer restrictions in the bylaws of the Company, and there shall be no further transfer of such Shares except in accordance with the terms of this Agreement and the bylaws of the Company; and *provided further*, that without the prior written consent of the Company, which may be withheld in the sole discretion of the Company, no more than three transfers may be made pursuant to this **Section 7**, including all transfers by the Holder and all transfers by any transferee.

H.    ***Termination of Right of First Refusal.*** The rights contained in this section shall terminate as to all Shares purchased hereunder upon the earlier of: (i) the closing date of the first sale of Common Stock of the Company to the general public pursuant to a registration statement filed with and declared effective by the Securities and Exchange Commission under the Securities Act, and (ii) the closing date of a Change of Control pursuant to which the holders of the outstanding voting securities of the Company receive securities of a class registered pursuant to Section 12 of the Securities Exchange Act of 1934, as amended.

8.    **Escrow.**

A.    ***Deposit.*** As security for the faithful performance of this Agreement, the Purchaser agrees, immediately upon receipt of any certificate(s) evidencing the Shares, to deliver any such certificate(s), together with a stock power in the form of Exhibit B attached to this Agreement,

executed by the Purchaser and by the Purchaser's spouse, if any (with the date and number of Shares left blank), to the Secretary of the Company or to another designee of the Company (the "***Escrow Agent***"). These documents shall be held by the Escrow Agent pursuant to the Joint Escrow Instructions of the Company and the Purchaser set forth in Exhibit C attached to this Agreement, which instructions are incorporated into this Agreement by this reference, and which instructions shall also be delivered to the Escrow Agent after the Closing.

        B.    ***Rights in Escrow Shares.*** Subject to the terms hereof, the Purchaser shall have all the rights of a stockholder with respect to such Shares while they are held in escrow, including without limitation, the right to vote the Shares. If, from time to time during the term of the Company's Repurchase Option, there is (i) any stock dividend, stock split or other change in the Shares, (ii) any dividend of cash or other property on the Shares, or (iii) any merger or sale of all or substantially all of the assets or other acquisition of the Company, any and all new, substituted or additional securities or cash or other consideration to which the Purchaser is entitled by reason of the Purchaser's ownership of the Shares shall immediately become subject to this escrow, deposited with the Escrow Agent and included thereafter as "***Shares***" for purposes of this Agreement and the Company's Repurchase Option.

        9.    **Tax Consequences.** The Purchaser has reviewed with the Purchaser's own tax advisors the federal, state, local and foreign tax consequences of this investment and the transactions contemplated by this Agreement. The Purchaser is relying solely on such advisors and not on any statements or representations of the Company or any of its agents. The Purchaser understands that the Purchaser (and not the Company) shall be responsible for any tax liability that may arise as a result of the transactions contemplated by this Agreement. The Purchaser understands that Section 83 of the Code taxes as ordinary income the difference between the purchase price for the Shares and the fair market value of the Shares as of the date any restrictions on the Shares lapse. In this context, "***restriction***" includes the right of the Company to buy back the Shares pursuant to the Repurchase Option. The Purchaser understands that the Purchaser may elect to be taxed at the time the Shares are purchased rather than when and as the Repurchase Option expires by filing an election under Section 83(b) of the Code with the Internal Revenue Service within 30 days from the date of purchase. **THE FORM FOR MAKING THIS SECTION 83(B) ELECTION IS ATTACHED TO THIS AGREEMENT AS EXHIBIT D AND THE PURCHASER (AND NOT THE COMPANY OR ANY OF ITS AGENTS) SHALL BE SOLELY RESPONSIBLE FOR APPROPRIATELY FILING SUCH FORM, EVEN IF THE PURCHASER REQUESTS THE COMPANY OR ITS AGENTS TO MAKE THIS FILING ON THE PURCHASER'S BEHALF.**

        10.    **General Provisions.**

        A.    ***Choice of Law.*** This Agreement shall be governed by the internal substantive laws, but not the choice of law rules, of California.

        B.    ***Integration.*** This Agreement, including all exhibits hereto, represents the entire agreement between the parties with respect to the purchase of the Shares by the Purchaser and supersedes and replaces any and all prior written or oral agreements regarding the subject matter of this Agreement including, but not limited to, any representations made during any interviews, relocation discussions or negotiations whether written or oral.

        C.    ***Notices.*** Any notice, demand, offer, request or other communication required or permitted to be given by either the Company or the Purchaser pursuant to the terms of this Agreement shall be in writing and shall be deemed effectively given the earlier of (i) when received, (ii) when delivered personally, (iii) one business day after being delivered by facsimile (with receipt of appropriate confirmation), (iv) one business day after being deposited with an overnight courier service or (v) four

days after being deposited in the U.S. mail, First Class with postage prepaid and return receipt requested, and addressed to the parties at the addresses provided to the Company (which the Company agrees to disclose to the other parties upon request) or such other address as a party may request by notifying the other in writing.

Subject to the limitations set forth in Section 232(e) of the Delaware General Corporation Law, the Purchaser consents to the delivery of any notice to stockholders given by the Company under the Delaware General Corporation Law or the Company's certificate of incorporation or bylaws by (i) facsimile telecommunication to the facsimile number set forth on the signature page (or to any other facsimile number for the Purchaser in the Company's records), (ii) electronic mail to the electronic mail address set forth on the signature page (or to any other electronic mail address for the Purchaser in the Company's records), (iii) posting on an electronic network together with separate notice to the Purchaser of such specific posting or (iv) any other form of electronic transmission (as defined in the Delaware General Corporation Law) directed to the Purchaser. This consent may be revoked by the Purchaser by written notice to the Company and may be deemed revoked in the circumstances specified in Section 232 of the Delaware General Corporation Law.

D.      ***Successors.*** Any successor to the Company (whether direct or indirect and whether by purchase, merger, consolidation, liquidation or otherwise) to all or substantially all of the Company's business and/or assets shall assume the obligations under this Agreement and agree expressly to perform the obligations under this Agreement in the same manner and to the same extent as the Company would be required to perform such obligations in the absence of a succession. For all purposes under this Agreement, the term "***Company***" shall include any successor to the Company's business and/or assets that executes and delivers the assumption agreement described in this section or which becomes bound by the terms of this Agreement by operation of law. Subject to the restrictions on transfer set forth in this Agreement, this Agreement shall be binding upon the Purchaser and his or her heirs, executors, administrators, successors and assigns.

E.      ***Assignment; Transfers.*** Except as set forth in this Agreement, this Agreement, and any and all rights, duties and obligations hereunder, shall not be assigned, transferred, delegated or sublicensed by the Purchaser without the prior written consent of the Company. Any attempt by the Purchaser without such consent to assign, transfer, delegate or sublicense any rights, duties or obligations that arise under this Agreement shall be void. Except as set forth in this Agreement, any transfers in violation of any restriction upon transfer contained in any section of this Agreement shall be void, unless such restriction is waived in accordance with the terms of this Agreement.

F.      ***Amendment; Waiver.*** Except as expressly provided herein, neither this Agreement nor any term hereof may be amended, waived, discharged or terminated other than by a written instrument referencing this Agreement and signed by the Company and the Purchaser. Either party's failure to enforce any provision of this Agreement shall not in any way be construed as a waiver of any such provision, nor prevent that party from thereafter enforcing any other provision of this Agreement. The rights granted both parties hereunder are cumulative and shall not constitute a waiver of either party's right to assert any other legal remedy available to it.

G.      ***Purchaser Investment Representations and Further Documents.*** The Purchaser agrees upon request to execute any further documents or instruments necessary or reasonably desirable in the view of the Company to carry out the purposes or intent of this Agreement, including (but not limited to) the applicable exhibits and attachments to this Agreement.

9

H.     ***Severability.*** Should any provision of this Agreement be found to be illegal or unenforceable, the other provisions shall nevertheless remain effective and shall remain enforceable to the greatest extent permitted by law.

I.     ***Rights as Stockholder.*** Subject to the terms and conditions of this Agreement, the Purchaser shall have all of the rights of a stockholder of the Company with respect to the Shares from and after the date that the Purchaser delivers a fully executed copy of this Agreement (including the applicable exhibits and attachments to this Agreement) and full payment for the Shares to the Company, and until such time as the Purchaser disposes of the Shares in accordance with this Agreement. Upon such transfer, the Purchaser shall have no further rights as a holder of the Shares so purchased except (in the case of a transfer to the Company) the right to receive payment for the Shares so purchased in accordance with the provisions of this Agreement, and the Purchaser shall forthwith cause any certificate(s) evidencing the Shares so purchased to be surrendered to the Company for transfer or cancellation.

J.     ***Adjustment for Stock Split.*** All references to the number of Shares and the purchase price of the Shares in this Agreement shall be adjusted to reflect any stock split, stock dividend or other change in the Shares which may be made after the date of this Agreement.

K.     ***Employment at Will.*** THE PURCHASER ACKNOWLEDGES AND AGREES THAT THE VESTING OF SHARES PURSUANT TO THIS AGREEMENT IS EARNED ONLY BY CONTINUING SERVICE AS A SERVICE PROVIDER AT WILL (AND NOT THROUGH THE ACT OF BEING HIRED OR PURCHASING SHARES HEREUNDER). THE PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREUNDER AND THE VESTING SCHEDULE SET FORTH HEREIN DO NOT CONSTITUTE AN EXPRESS OR IMPLIED PROMISE OF CONTINUED ENGAGEMENT AS A SERVICE PROVIDER FOR THE VESTING PERIOD, OR FOR ANY PERIOD AT ALL, AND SHALL NOT INTERFERE WITH THE PURCHASER'S RIGHT OR THE COMPANY'S RIGHT TO TERMINATE THE PURCHASER'S RELATIONSHIP WITH THE COMPANY AT ANY TIME, WITH OR WITHOUT CAUSE OR NOTICE.

L.     ***Arbitration and Equitable Relief.***

(1)     *Arbitration.* IN CONSIDERATION OF THE PROMISES IN THIS AGREEMENT, THE PURCHASER AGREES THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES WITH ANYONE (INCLUDING THE COMPANY AND ANY EMPLOYEE, OFFICER, DIRECTOR, SHAREHOLDER OR BENEFIT PLAN OF THE COMPANY IN THEIR CAPACITY AS SUCH OR OTHERWISE) ARISING OUT OF, RELATING TO, OR RESULTING FROM THIS AGREEMENT, SHALL BE SUBJECT TO BINDING ARBITRATION UNDER THE ARBITRATION RULES SET FORTH IN CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 1280 THROUGH 1294.2, INCLUDING SECTION 1283.05 (THE "***RULES***") AND PURSUANT TO CALIFORNIA LAW. DISPUTES WHICH THE PURCHASER AGREES TO ARBITRATE, AND THEREBY AGREES TO WAIVE ANY RIGHT TO A TRIAL BY JURY, INCLUDE ANY STATUTORY CLAIMS UNDER STATE OR FEDERAL LAW, INCLUDING, BUT NOT LIMITED TO, CLAIMS UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, THE AMERICANS WITH DISABILITIES ACT OF 1990, THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, THE OLDER WORKERS BENEFIT PROTECTION ACT, THE WORKER ADJUSTMENT AND RETRAINING NOTIFICATION ACT, THE CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT, THE FAMILY AND MEDICAL LEAVE ACT, THE CALIFORNIA FAMILY RIGHTS ACT, THE CALIFORNIA LABOR CODE, CLAIMS OF HARASSMENT, DISCRIMINATION OR WRONGFUL TERMINATION AND ANY STATUTORY CLAIMS. THE PURCHASER FURTHER

UNDERSTANDS THAT THIS AGREEMENT TO ARBITRATE ALSO APPLIES TO ANY DISPUTES THAT THE COMPANY MAY HAVE WITH THE PURCHASER.

(2)     *Procedure.* THE PURCHASER AGREES THAT ANY ARBITRATION WILL BE ADMINISTERED BY THE AMERICAN ARBITRATION ASSOCIATION ("*AAA*") AND THAT THE NEUTRAL ARBITRATOR WILL BE SELECTED IN A MANNER CONSISTENT WITH ITS NATIONAL RULES FOR THE RESOLUTION OF EMPLOYMENT DISPUTES. THE PURCHASER AGREES THAT THE ARBITRATOR SHALL HAVE THE POWER TO DECIDE ANY MOTIONS BROUGHT BY ANY PARTY TO THE ARBITRATION, INCLUDING MOTIONS FOR SUMMARY JUDGMENT AND/OR ADJUDICATION AND MOTIONS TO DISMISS AND DEMURRERS, PRIOR TO ANY ARBITRATION HEARING. THE PURCHASER ALSO AGREES THAT THE ARBITRATOR SHALL HAVE THE POWER TO AWARD ANY REMEDIES, INCLUDING ATTORNEYS' FEES AND COSTS, AVAILABLE UNDER APPLICABLE LAW. THE PURCHASER UNDERSTANDS THAT THE COMPANY WILL PAY FOR ANY ADMINISTRATIVE OR HEARING FEES CHARGED BY THE ARBITRATOR OR AAA EXCEPT THAT THE PURCHASER SHALL PAY THE FIRST $125.00 OF ANY FILING FEES ASSOCIATED WITH ANY ARBITRATION THE PURCHASER INITIATES. THE PURCHASER AGREES THAT THE ARBITRATOR SHALL ADMINISTER AND CONDUCT ANY ARBITRATION IN A MANNER CONSISTENT WITH THE RULES AND THAT TO THE EXTENT THAT THE AAA'S NATIONAL RULES FOR THE RESOLUTION OF EMPLOYMENT DISPUTES CONFLICT WITH THE RULES, THE RULES SHALL TAKE PRECEDENCE. THE PURCHASER AGREES THAT THE DECISION OF THE ARBITRATOR SHALL BE IN WRITING. THE PURCHASER AGREES THAT ANY ARBITRATION UNDER THIS AGREEMENT SHALL BE CONDUCTED IN SANTA CLARA COUNTY, CALIFORNIA.

(3)     *Remedy.* EXCEPT AS PROVIDED BY THE RULES AND THIS AGREEMENT, ARBITRATION SHALL BE THE SOLE, EXCLUSIVE AND FINAL REMEDY FOR ANY DISPUTE BETWEEN THE PURCHASER AND THE COMPANY. ACCORDINGLY, EXCEPT AS PROVIDED FOR BY THE RULES AND THIS AGREEMENT, NEITHER THE PURCHASER NOR THE COMPANY WILL BE PERMITTED TO PURSUE COURT ACTION REGARDING CLAIMS THAT ARE SUBJECT TO ARBITRATION. NOTWITHSTANDING, THE ARBITRATOR WILL NOT HAVE THE AUTHORITY TO DISREGARD OR REFUSE TO ENFORCE ANY LAWFUL COMPANY POLICY, AND THE ARBITRATOR SHALL NOT ORDER OR REQUIRE THE COMPANY TO ADOPT A POLICY NOT OTHERWISE REQUIRED BY LAW WHICH THE COMPANY HAS NOT ADOPTED.

(4)     *Availability of Injunctive Relief.* BOTH PARTIES AGREE THAT ANY PARTY MAY PETITION A COURT FOR INJUNCTIVE RELIEF AS PERMITTED BY THE RULES INCLUDING, BUT NOT LIMITED TO, WHERE EITHER PARTY ALLEGES OR CLAIMS A VIOLATION OF ANY CONFIDENTIAL INFORMATION OR INVENTION ASSIGNMENT AGREEMENT BETWEEN THE PURCHASER AND THE COMPANY OR ANY OTHER AGREEMENT REGARDING TRADE SECRETS, CONFIDENTIAL INFORMATION, NONSOLICITATION OR LABOR CODE §2870. BOTH PARTIES UNDERSTAND THAT ANY BREACH OR THREATENED BREACH OF SUCH AN AGREEMENT WILL CAUSE IRREPARABLE INJURY AND THAT MONEY DAMAGES WILL NOT PROVIDE AN ADEQUATE REMEDY THEREFOR AND BOTH PARTIES HEREBY CONSENT TO THE ISSUANCE OF AN INJUNCTION. IN THE EVENT EITHER PARTY SEEKS INJUNCTIVE RELIEF, THE PREVAILING PARTY SHALL BE ENTITLED TO RECOVER REASONABLE COSTS AND ATTORNEYS' FEES.

(5)     *Administrative Relief.* THE PURCHASER UNDERSTANDS THAT THIS AGREEMENT DOES NOT PROHIBIT THE PURCHASER FROM PURSUING AN

ADMINISTRATIVE CLAIM WITH A LOCAL, STATE OR FEDERAL ADMINISTRATIVE BODY SUCH AS THE DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING, THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION OR THE WORKERS' COMPENSATION BOARD. THIS AGREEMENT DOES, HOWEVER, PRECLUDE THE PURCHASER FROM PURSUING COURT ACTION REGARDING ANY SUCH CLAIM.

(6) *Voluntary Nature of Agreement.* THE PURCHASER ACKNOWLEDGES AND AGREES THAT THE PURCHASER IS EXECUTING THIS AGREEMENT VOLUNTARILY AND WITHOUT ANY DURESS OR UNDUE INFLUENCE BY THE COMPANY OR ANYONE ELSE. THE PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT THE PURCHASER HAS CAREFULLY READ THIS AGREEMENT AND THAT THE PURCHASER HAS ASKED ANY QUESTIONS NEEDED FOR THE PURCHASER TO UNDERSTAND THE TERMS, CONSEQUENCES AND BINDING EFFECT OF THIS AGREEMENT AND FULLY UNDERSTANDS IT, INCLUDING THAT ***THE PURCHASER IS WAIVING THE PURCHASER'S RIGHT TO A JURY TRIAL***. FINALLY, THE PURCHASER AGREES THAT THE PURCHASER HAS BEEN PROVIDED AN OPPORTUNITY TO SEEK THE ADVICE OF AN ATTORNEY OF THE PURCHASER'S CHOICE BEFORE SIGNING THIS AGREEMENT.

M. ***Reliance on Counsel and Advisors.*** The Purchaser acknowledges that Wilson Sonsini Goodrich & Rosati, Professional Corporation, is representing only the Company in this transaction. The Purchaser acknowledges that he or she has had the opportunity to review this Agreement, including all attachments hereto, and the transactions contemplated by this Agreement with his or her own legal counsel, tax advisors and other advisors. The Purchaser is relying solely on his or her own counsel and advisors and not on any statements or representations of the Company or its agents for legal or other advice with respect to this investment or the transactions contemplated by this Agreement.

N. ***Counterparts.*** This Agreement may be executed in one or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same agreement. Facsimile copies of signed signature pages shall be binding originals.

*(signature page follows)*

12

The parties represent that they have read this Agreement in its entirety, have had an opportunity to obtain the advice of counsel prior to executing this Agreement and fully understand this Agreement. The Purchaser agrees to notify the Company of any change in his or her contact information below.

**XUAN JIANG**

Signature

Xuan Jiang

Print Name

801 S Winchester Boulevard, #4316, San Jose, CA 95128

tianjijx3009216038@gmail.com

Email

Fax

**RUN THE WORLD, INC.**

Signature

Xiaoyin Qu

Print Name

CEO

Print Title

801 S Winchester Boulevard, #4316, San Jose, CA 95128

**Exhibit A**

**INVESTMENT REPRESENTATION STATEMENT**

PURCHASER  :      Xuan Jiang

COMPANY        :      Run The World, Inc.

SECURITY         :      Common Stock

AMOUNT          :      4,000,000 shares

DATE                 :      July 10, 2019

---

In connection with the purchase of the above-listed shares, I, the undersigned purchaser, represent to the Company as follows:

1.        ***The Company may rely on these representations.*** I understand that the Company's sale of the shares to me has not been registered under the Securities Act of 1933, as amended (the "***Securities Act***"), because the Company believes, relying in part on my representations in this document, that an exemption from such registration requirement is available for such sale. I understand that the availability of this exemption depends upon the representations I am making to the Company in this document being true and correct.

2.        ***I am purchasing for investment.*** I am purchasing the shares solely for investment purposes, and not for further distribution. My entire legal and beneficial ownership interest in the shares is being purchased and shall be held solely for my account, except to the extent I intend to hold the shares jointly with my spouse. I am not a party to, and do not presently intend to enter into, any contract or other arrangement with any other person or entity involving the resale, transfer, grant of participation with respect to or other distribution of any of the shares. My investment intent is not limited to my present intention to hold the shares for the minimum capital gains period specified under any applicable tax law, for a deferred sale, for a specified increase or decrease in the market price of the shares, or for any other fixed period in the future.

3.        ***I can protect my own interests.*** I can properly evaluate the merits and risks of an investment in the shares and can protect my own interests in this regard, whether by reason of my own business and financial expertise, the business and financial expertise of certain professional advisors unaffiliated with the Company with whom I have consulted, or my preexisting business or personal relationship with the Company or any of its officers, directors or controlling persons.

4.        ***I am informed about the Company.*** I am sufficiently aware of the Company's business affairs and financial condition to reach an informed and knowledgeable decision to acquire the shares. I have had an opportunity to discuss the plans, operations and financial condition of the Company with its officers, directors or controlling persons, and have received all information I deem appropriate for assessing the risk of an investment in the shares.

5.        ***I recognize my economic risk.*** I realize that the purchase of the shares involves a high degree of risk, and that the Company's future prospects are uncertain. I am able to hold the shares indefinitely if required, and am able to bear the loss of my entire investment in the shares.

6. ***I know that the shares are restricted securities.*** I understand that the shares are "restricted securities" in that the Company's sale of the shares to me has not been registered under the Securities Act in reliance upon an exemption for non-public offerings. In this regard, I also understand and agree that:

A. I must hold the shares indefinitely, unless any subsequent proposed resale by me is registered under the Securities Act, or unless an exemption from registration is otherwise available (such as Rule 144);

B. the Company is under no obligation to register any subsequent proposed resale of the shares by me; *and*

C. the certificate evidencing the shares (or the notice of issuance of uncertificated stock, as applicable) will be imprinted with a legend which prohibits the transfer of the shares unless such transfer is registered or such registration is not required in the opinion of counsel for the Company.

7. ***I am familiar with Rule 144.*** I am familiar with Rule 144 adopted under the Securities Act, which in some circumstances permits limited public resales of "restricted securities" like the shares acquired from an issuer in a non-public offering. I understand that my ability to sell the shares under Rule 144 in the future is uncertain, and may depend upon, among other things: (i) the availability of certain current public information about the Company; (ii) the resale occurring more than a specified period after my purchase and full payment (within the meaning of Rule 144) for the shares; and (iii) if I am an affiliate of the Company (A) the sale being made in an unsolicited "broker's transaction," transactions directly with a market maker or riskless principal transactions, as those terms are defined under the Securities Exchange Act of 1934, as amended, (B) the amount of shares being sold during any three-month period not exceeding the specified limitations stated in Rule 144, and (C) timely filing of a notice of proposed sale on Form 144, if applicable.

8. ***I know that Rule 144 may never be available.*** I understand that the requirements of Rule 144 may never be met, and that the shares may never be saleable under the rule. I further understand that at the time I wish to sell the shares, there may be no public market for the Company's stock upon which to make such a sale, or the current public information requirements of Rule 144 may not be satisfied, either of which may preclude me from selling the shares under Rule 144 even if the relevant holding period had been satisfied.

9. ***I know that I am subject to further restrictions on resale.*** I understand that in the event Rule 144 is not available to me, any future proposed sale of any of the shares by me will not be possible without prior registration under the Securities Act, compliance with some other registration exemption (which may or may not be available), or *each* of the following: (i) my written notice to the Company containing detailed information regarding the proposed sale, (ii) my providing an opinion of my counsel to the effect that such sale will not require registration, and (iii) the Company notifying me in writing that its counsel concurs in such opinion. I understand that neither the Company nor its counsel is obligated to provide me with any such opinion. I understand that although Rule 144 is not exclusive, the Staff of the SEC has stated that persons proposing to sell private placement securities other than in a registered offering or pursuant to Rule 144 will have a substantial burden of proof in establishing that an exemption from registration is available for such offers or sales, and that such persons and their respective brokers who participate in such transactions do so at their own risk.

10. ***I know that I may have tax liability due to the uncertain value of the shares.*** I understand that the board of directors believes its valuation of the shares represents a fair appraisal of their worth, but that it remains possible that, with the benefit of hindsight, the Internal Revenue Service

10. ***I know that I may have tax liability due to the uncertain value of the shares.*** I understand that the board of directors believes its valuation of the shares represents a fair appraisal of their worth, but that it remains possible that, with the benefit of hindsight, the Internal Revenue Service ("***IRS***") may successfully assert that the value of the shares on the date of my purchase is substantially greater than the board of directors' appraisal. I understand that any additional value ascribed to the shares by such an IRS determination will constitute ordinary income to me as of the purchase date, and that any additional taxes and interest due as a result will be my sole responsibility payable only by me, and that the Company need not and will not reimburse me for that tax liability.

11. ***Residence.*** The address of my principal residence is set forth on the signature page below.

12. ***No "bad actor" disqualification events.*** Neither I nor any person that would be deemed a beneficial owner of the shares (in accordance with Rule 506(d) of the Securities Act) is subject to any of the "bad actor" disqualifications described in Rule 506(d)(1)(i) through (viii) under the Securities Act, except as set forth in Rule 506(d)(2)(ii) or (iii) or (d)(3) under the Securities Act and disclosed, reasonably in advance of the purchase or acquisition of the shares, in writing in reasonable detail to the Company.

By signing below, I acknowledge my agreement with each of the statements contained in this Investment Representation Statement as of the date first set forth above, and my intent for the Company to rely on such statements in issuing the shares to me.

_____
*Purchaser's Signature*

Xuan Jiang
_____
*Print Name*

Address of Purchaser's principal residence:

801 S Winchester Boulevard, #4316, San Jose, CA 95128

**Exhibit B**

**STOCK POWER AND ASSIGNMENT**

FOR VALUE RECEIVED and pursuant to that certain Restricted Stock Purchase Agreement dated as of July __, 2019, the undersigned hereby sells, assigns and transfers unto _____, _____ (_____) shares of Common Stock of Run The World, Inc., a Delaware corporation, standing in the undersigned's name on the books of said corporation represented by certificate number _____ delivered herewith (for certificated shares) or by entry number _____ (for uncertificated shares), and does hereby irrevocably constitute and appoint _____ as attorney-in-fact, with full power of substitution, to transfer said stock on the books of said corporation.

Dated:

_____
(*Signature*)

Xuan Jiang_____
(*Print Name*)

_____
(*Spouse's Signature, if any*)

_____
(*Print Name*)

This Assignment was executed in conjunction with the terms of a Restricted Stock Purchase Agreement between the above assignor and the above corporation, dated as of July __, 2019.

**Instruction: Please do not fill in any blanks other than the signature and name lines.**

**Exhibit C**

**JOINT ESCROW INSTRUCTIONS**


July 10, 2019


Run The World, Inc.
801 S Winchester Boulevard, #4316, San Jose, CA 95128
Attn: Secretary

Dear Secretary:

As Escrow Agent for both Run The World, Inc., a Delaware corporation (the "***Company***"), and Xuan Jiang (the "***Purchaser***"), you are hereby authorized and directed to hold the documents delivered to you pursuant to the terms of that certain Restricted Stock Purchase Agreement (the "***Agreement***"), dated as of July 10, 2019, to which a copy of these Joint Escrow Instructions is attached, in accordance with the following instructions:

1.      In the event that the Company and/or any assignee of the Company (referred to collectively for convenience herein as the "***Company***") exercises the Repurchase Option set forth in the Agreement, the Company shall give to the Purchaser and you a written notice specifying the number of shares of stock to be purchased, the purchase price, and the time for a closing hereunder at the principal office of the Company. The Purchaser and the Company hereby irrevocably authorize and direct you to close the transaction contemplated by such notice in accordance with the terms of said notice.

2.      At the closing, you are directed (a) to date the stock assignments necessary for the transfer in question, (b) to fill in the number of shares being transferred, and (c) to deliver the same, together with any certificate(s) evidencing the shares of stock to be transferred, to the Company against the simultaneous delivery to you of the purchase price (by check or such other form of consideration mutually agreed to by the parties) for the number of shares of stock being purchased pursuant to the exercise of the Repurchase Option.

3.      The Purchaser irrevocably authorizes the Company to deposit with you any certificates evidencing shares of stock to be held by you hereunder and any additions and substitutions to said shares as defined in the Agreement. The Purchaser does hereby irrevocably constitute and appoint you as his or her attorney-in-fact and agent for the term of this escrow to execute with respect to such securities all documents necessary or appropriate to make such securities negotiable and to complete any transaction herein contemplated. Subject to the provisions of this **paragraph 3**, the Purchaser shall exercise all rights and privileges of a stockholder of the Company while the stock is held by you.

4.      Upon written request of the Purchaser after each successive one-year period from the date of the Agreement, unless the Repurchase Option has been exercised, you will deliver to the Purchaser, in the case of certificated stock, a certificate or certificates representing so many shares of stock remaining in escrow as are not then subject to the Repurchase Option or, in the case of uncertificated stock, a notice indicating the shares of stock remaining in escrow that are not then subject to the Repurchase Option.

5.  If at the time of termination of this escrow you should have in your possession any documents, securities, or other property belonging to the Purchaser, you shall deliver all of same to the Purchaser and shall be discharged of all further obligations hereunder.

6.  Your duties hereunder may be altered, amended, modified or revoked only by a writing signed by all of the parties hereto.

7.  You shall be obligated only for the performance of such duties as are specifically set forth herein and may rely and shall be protected in relying or refraining from acting on any instrument reasonably believed by you to be genuine and to have been signed or presented by the proper party or parties. You shall not be personally liable for any act you may do or omit to do hereunder as Escrow Agent or as attorney-in-fact for the Purchaser while acting in good faith and in the exercise of your own good judgment, and any act done or omitted by you pursuant to the advice of your own attorneys shall be conclusive evidence of such good faith.

8.  The Company and the Purchaser hereby jointly and severally expressly agree to indemnify and hold harmless you and your designees against any and all claims, losses, liabilities, damages, deficiencies, costs and expenses, including reasonable attorneys' fees and expenses of investigation and defense incurred or suffered by you and your designees, directly or indirectly, as a result of any of your actions or omissions or those of your designees while acting in good faith and in the exercise of your judgment under the Agreement, these Joint Escrow Instructions, exhibits hereto or written instructions from the Company or the Purchaser hereunder.

9.  You are hereby expressly authorized to disregard any and all warnings given by any of the parties hereto or by any other person or corporation, excepting only orders or process of courts of law, and are hereby expressly authorized to comply with and obey orders, judgments or decrees of any court. In case you obey or comply with any such order, judgment or decree, you shall not be liable to any of the parties hereto or to any other person, firm or corporation by reason of such compliance, notwithstanding any such order, judgment or decree being subsequently reversed, modified, annulled, set aside, vacated or found to have been entered without jurisdiction.

10. You shall not be liable in any respect on account of the identity, authorities or rights of the parties executing or delivering or purporting to execute or deliver the Agreement or any documents or papers deposited or called for hereunder.

11. You shall be entitled to employ such legal counsel and other experts as you may deem necessary properly to advise you in connection with your obligations hereunder, may rely upon the advice of such counsel, and may pay such counsel reasonable compensation therefor. The Company shall reimburse you for any such disbursements.

12. Your responsibilities as Escrow Agent hereunder shall terminate if you shall resign by written notice to each party. In the event of any such termination, the Company shall appoint a successor Escrow Agent.

13. You are expressly authorized to delegate your duties as Escrow Agent hereunder to the law firm of Wilson Sonsini Goodrich & Rosati, P.C., or any other law firm, which delegation, if any, may change from time to time and shall survive your resignation as Escrow Agent.

14. If you reasonably require other or further instruments in connection with these Joint Escrow Instructions or obligations in respect hereto, the necessary parties hereto shall join in furnishing such instruments.

15.     It is understood and agreed that should any dispute arise with respect to the delivery and/or ownership or right of possession of the securities held by you hereunder, you are authorized and directed to retain in your possession without liability to anyone all or any part of said securities until such disputes shall have been settled either by mutual written agreement of the parties concerned or by a final order, decree or judgment of a court of competent jurisdiction after the time for appeal has expired and no appeal has been perfected, but you shall be under no duty whatsoever to institute or defend any such proceedings.

16.     Any notice required or permitted hereunder shall be given in writing and shall be deemed effectively given upon personal delivery or four days following deposit in the United States Post Office, by registered or certified mail with postage and fees prepaid and return receipt requested, addressed to each of the other parties thereunto entitled at the following addresses, or at such other addresses as a party may designate by written notice to each of the other parties hereto.

COMPANY:                        Run The World, Inc.
                                801 S Winchester Boulevard, #4316, San Jose, CA 95128
                                Attn: President

PURCHASER:                      Xuan Jiang
                                801 S Winchester Boulevard, #4316, San Jose, CA 95128

ESCROW AGENT:                   Secretary
                                801 S Winchester Boulevard, #4316, San Jose, CA 95128

17.     By signing these Joint Escrow Instructions, you become a party hereto only for the purpose of said Joint Escrow Instructions; you do not become a party to the Agreement.

18.     This instrument shall be binding upon and inure to the benefit of the parties hereto, and their respective successors and permitted assigns.

Very truly yours,

RUN THE WORLD, INC.

By: _____

Print Name: Xiaoyin Qu

Title: CEO


PURCHASER:
Xuan Jiang

_____
(signature)


ESCROW AGENT:

_____
Xiaoyin Qu, Secretary

**IF YOU WISH TO MAKE A SECTION 83(B) ELECTION, THE FILING OF SUCH ELECTION IS <u>YOUR</u> RESPONSIBILITY.**

**THE FORM FOR MAKING THIS SECTION 83(B) ELECTION IS ATTACHED TO THIS AGREEMENT AS EXHIBIT D.**

**<u>YOU</u> MUST FILE THIS FORM WITHIN 30 DAYS OF PURCHASING THE SHARES.**

**<u>YOU</u> (AND <u>NOT</u> THE COMPANY OR ANY OF ITS AGENTS) SHALL BE SOLELY RESPONSIBLE FOR FILING SUCH FORM WITH THE IRS, EVEN IF YOU REQUEST THE COMPANY OR ITS AGENTS TO MAKE THIS FILING ON YOUR BEHALF AND EVEN IF THE COMPANY OR ITS AGENTS HAVE PREVIOUSLY MADE THIS FILING ON YOUR BEHALF.**

*The election should be filed by mailing a signed election form by certified mail, return receipt requested to the IRS Service Center where you file your tax returns. See www.irs.gov*

**Exhibit D**
**ELECTION UNDER SECTION 83(b) OF THE**
**INTERNAL REVENUE CODE OF 1986, AS AMENDED**

The undersigned taxpayer hereby elects, pursuant to Section 83(b) of the Internal Revenue Code of 1986, as amended, to include in his or her gross income the amount of any compensation taxable to him or her in connection with his or her receipt of the property described below:

1.      The name, address and taxpayer identification number of the undersigned and the taxable year for which this election is being made are as follows:

NAME OF TAXPAYER: Xuan Jiang            SPOUSE: _____

TAXPAYER'S ADDRESS:  801 S Winchester Boulevard, #4316, San Jose, CA 95128

TAXPAYER ID #: _____      SPOUSE'S ID #: _____

TAXABLE YEAR: 2019

2.      The property with respect to which the election is made is described as follows: 4,000,000 shares (the "***Shares***") of the Common Stock of Run The World, Inc. (the "***Company***").

3.      The date on which the property was transferred is: July __, 2019.

4.      The property is subject to the following restrictions: The Shares may be repurchased by the Company, or its assignee, upon the occurrence of certain events. This right lapses with regard to a portion of the Shares over time.

5.      The fair market value at the time of transfer, determined without regard to any restriction other than a restriction which by its terms will never lapse, of such property is: $400.00.

6.      The amount, if any, paid for such property: $400.00.

The undersigned has submitted a copy of this statement to the person for whom the services were performed in connection with the undersigned's receipt of the above-described property. The transferee of such property is the person performing the services in connection with the transfer of said property.

The undersigned understand(s) that the foregoing election may not be revoked except with the consent of the Commissioner.

Dated:_____          _____
                           Xuan Jiang, Taxpayer

The undersigned spouse of taxpayer joins in this election.

Dated:_____          _____
                           _____, Spouse of Taxpayer

# EXHIBIT B

# RUN THE WORLD, INC.

October 4, 2019

Xuan Jiang
801 S Winchester Blvd, Apt 4316
San Jose, CA 95128

Dear Xuan:

   We refer to that certain Restricted Stock Purchase Agreement between Run The World, Inc. (the "Company") and you, dated July 10, 2019 (the "Purchase Agreement"). Capitalized terms not defined in this letter have the meaning set forth in the Purchase Agreement. As you know, pursuant to the Purchase Agreement, you transferred and assigned to the Company (i) the Business Plan and (ii) any and all right, title and interest you had in the Company's business and any Intellectual Property related to the Company's business, as currently conducted and as contemplated to be conducted pursuant to the Business Plan and otherwise (collectively, the "RSPA Materials"). The RSPA Materials included the items described in Exhibit A attached to this letter.

   This letter is to confirm that (i) the Company has determined that the RSPA Materials are not necessary to the Company's business as now conducted or as currently proposed to be conducted and (ii) the Company is not using the RSPA Materials in any of its current products or services, nor will the Company use the RSPA Materials in any of its future products or services. In addition, by countersigning this letter, you confirm that, except for the RSPA Materials outlined on Exhibit A, you have not conceived, developed or reduced to practice any materials or Intellectual Property relating to the Business Plan or the Company's business. For the avoidance of doubt and without limiting the foregoing, the Company has destroyed all copies of the RSPA Materials, including any embodiments thereof.

   Please indicate your agreement with this letter by signing it and returning it to my attention.

* * *

Very truly yours,

**RUN THE WORLD, INC.**

_____
Name: Xiaoyin Qu
Title: President

Acknowledged and agreed:

_____
Xuan Jiang

*[Signature Page to Intellectual Property Letter Agreement]*

Very truly yours,

**RUN THE WORLD, INC.**

_____

Name: Xiaoyin Qu
Title: President

Acknowledged and agreed:

_____
Xuan Jiang

*[Signature Page to Intellectual Property Letter Agreement]*

**EXHIBIT A**

Certain RSPA Materials

The organizer web tool developed using Wix.com, accessible at https://www.runtheworld.today/addhost

Code written to integrate third-party services (including, without limitation, Stripe, PayPal, and ActiveCampaign) into a website

Code written for a website promoting or involving any of the foregoing, including, without limitation, any code written for the Company's website accessible at

      https://www.runtheworld.today/conference/a5749ea1-8ed7-4cc9-8e78-da87ebc75f9f
      https://www.runtheworld.today/conference/d02d572f-b284-4da9-9720-e073871078da
      https://www.runtheworld.today/conference/1a4b2a7c-a7a9-4911-8d46-f463c6fe51f6
      https://www.runtheworld.today/conferences/9ee7ff41-8b67-4218-881c-309b7588debd
      https://www.runtheworld.today/conference/e6a9c9eb-e6b0-4ed9-a5b3-08205e3a1c99
      https://www.runtheworld.today/conference/1a4b2a7c-a7a9-4911-8d46-f463c6fe51f6
      https://www.runtheworld.today/silicon-wall
      https://www.runtheworld.today/attendees/
      https://www.runtheworld.today/prom-code-page

# EXHIBIT C

# RUN THE WORLD, INC.

801 S Winchester Blvd, #4316
San Jose, CA 95128

October 14, 2019

Xuan Jiang
801 S Winchester Blvd
San Jose, CA 95117

Dear Xuan:

Run the World Inc. (the "Company") is pleased to offer you employment on the following terms:

1.      **Position**.  Your initial title will be **Director of Engineering**, and you will initially report to the Company's **founder and CEO, Xiaoyin Qu**.  This is a full-time position. While you render services to the Company, you will not engage in any other employment, consulting or other business activity (whether full-time or part-time) that would create a conflict of interest with the Company.  By signing this letter agreement, you confirm to the Company that you have no contractual commitments or other legal obligations that would prohibit you from performing your duties for the Company.

2.      **Cash Compensation**.  The Company will pay you a starting salary at the rate of $132,000 per year, payable in accordance with the Company's standard payroll schedule.  This salary will be subject to adjustment pursuant to the Company's employee compensation policies in effect from time to time.

3.      **Employee Benefits**.  As a regular employee of the Company, you will be eligible to participate in a number of Company-sponsored benefits.  In addition, you will be entitled to paid vacation in accordance with the Company's vacation policy, as in effect from time to time.

4.      **Proprietary Information and Inventions Agreement**.  Like all Company employees, you will be required, as a condition of your employment with the Company, to sign the Company's standard Proprietary Information and Inventions Agreement, a copy of which is attached hereto as **Exhibit A**.

5.      **Employment Relationship**.  Employment with the Company is for no specific period of time.  Your employment with the Company will be "at will," meaning that either you or the Company may terminate your employment at any time and for any reason, with or without cause.  Any contrary representations that may have been made to you are superseded by this letter agreement.  This is the full and complete agreement between you and the Company on this term. Although your job duties, title, compensation and benefits, as well as the Company's personnel policies and procedures, may change from time to time, the "at will" nature of your employment may

Xuan Jiang
October 14, 2019
Page 2

only be changed in an express written agreement signed by you and a duly authorized officer of the Company (other than you).

     6.     **Tax Matters**.

     (a)     **Withholding**.  All forms of compensation referred to in this letter agreement are subject to reduction to reflect applicable withholding and payroll taxes and other deductions required by law.

     (b)     **Tax Advice**.  You are encouraged to obtain your own tax advice regarding your compensation from the Company.  You agree that the Company does not have a duty to design its compensation policies in a manner that minimizes your tax liabilities, and you will not make any claim against the Company or its Board of Directors related to tax liabilities arising from your compensation.

     7.     **Interpretation, Amendment and Enforcement**.  This letter agreement and Exhibit A supersede and replace any prior agreements, representations or understandings (whether written, oral, implied or otherwise) between you and the Company and constitute the complete agreement between you and the Company regarding the subject matter set forth herein.  This letter agreement may not be amended or modified, except by an express written agreement signed by both you and a duly authorized officer of the Company.  The terms of this letter agreement and the resolution of any disputes as to the meaning, effect, performance or validity of this letter agreement or arising out of, related to, or in any way connected with, this letter agreement, your employment with the Company or any other relationship between you and the Company (the "Disputes") will be governed by California law, excluding laws relating to conflicts or choice of law.  You and the Company submit to the exclusive personal jurisdiction of the federal and state courts located in California in connection with any Dispute or any claim related to any Dispute.

     * * * * *

     We hope that you will accept our offer to join the Company.  You may indicate your agreement with these terms and accept this offer by signing and dating both the enclosed duplicate original of this letter agreement and the enclosed Proprietary Information and Inventions Agreement and returning them to me.  This offer, if not accepted, will expire at the close of business on October 14,  2019.  As required by law, your employment with the Company is contingent upon your providing legal proof of your identity and authorization to work in the United States.  Your employment is also contingent upon your starting work with the Company on or before October 14,  2019.

     If you have any questions, please call me at (650) 309 2243

     Very truly yours,

     RUN THE WORLD, INC.

Xuan Jiang
October 14, 2019
Page 3

By: __Xiaoyin Qu_____

Title: CEO_____

I have read and accept this employment offer:

_____
Signature of Employee

Dated: __10/14/2019_____

**Attachment**

Exhibit A:  Proprietary Information and Inventions Agreement

# PROPRIETARY INFORMATION AND INVENTIONS AGREEMENT

The following confirms and memorializes an agreement that Run The World, Inc., a Delaware corporation (the "Company") and I,  Xuan Jiang, have had since the commencement of my employment (which term, for purposes of this agreement, shall be deemed to include any relationship of service to the Company that I may have had prior to actually becoming an employee) with the Company in any capacity and that is and has been a material part of the consideration for my employment by Company:

1.        I have not entered into, and I agree I will not enter into, any agreement either written or oral in conflict with this Agreement or my employment with Company.  I will not violate any agreement with or rights of any third party or, except as expressly authorized by Company in writing hereafter, use or disclose my own or any third party's confidential information or intellectual property when acting within the scope of my employment or otherwise on behalf of Company.  Further, I have not retained anything containing any confidential information of a prior employer or other third party, whether or not created by me.

2.        Company shall own all right, title and interest (including patent rights, copyrights, trade secret rights, mask work rights, *sui generis* database rights and all other intellectual property rights of any sort throughout the world) relating to any and all inventions (whether or not patentable), works of authorship, mask works, designs, know-how, ideas and information made or conceived or reduced to practice, in whole or in part, by me during the term of my employment with Company to and only to the fullest extent allowed by California Labor Code Section 2870 (which is attached as Appendix A) (collectively "Inventions") and I will promptly disclose all Inventions to Company.  Without disclosing any third party confidential information, I will also disclose anything I believe is excluded by Section 2870 so that the Company can make an independent assessment.  I hereby make all assignments necessary to accomplish the foregoing.  I shall further assist Company, at Company's expense, to further evidence, record and perfect such assignments, and to perfect, obtain, maintain, enforce, and defend any rights specified to be so owned or assigned.  I hereby irrevocably designate and appoint Company as my agent and attorney-in-fact, coupled with an interest and with full power of substitution, to act for and in my behalf to execute and file any document and to do all other lawfully permitted acts to further the purposes of the foregoing with the same legal force and effect as if executed by me.  Without limiting paragraph 1 or Company's other rights and remedies, if, when acting within the scope of my employment or otherwise on behalf of Company, I use or disclose my own or any third party's confidential information or intellectual property (or if any Invention cannot be fully made, used, reproduced, distributed and otherwise exploited without using or violating the foregoing), Company will have and I hereby grant Company a perpetual, irrevocable, worldwide royalty-free, non-exclusive, sublicensable right and license to exploit and exercise all such confidential information and intellectual property rights.

3.        To the extent allowed by law, paragraph 2 includes all rights of paternity, integrity, disclosure and withdrawal and any other rights that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively "Moral Rights").  To the extent I retain any such Moral Rights under applicable law, I hereby ratify and consent to any action that may be taken with respect to such Moral Rights by or authorized by Company and

agree not to assert any Moral Rights with respect thereto. I will confirm any such ratifications, consents and agreements from time to time as requested by Company.

4.    I agree that all Inventions and all other business, technical and financial information (including, without limitation, the identity of and information relating to customers or employees) I develop, learn or obtain during the term of my employment that relate to Company or the business or demonstrably anticipated business of Company or that are received by or for Company in confidence, constitute "Proprietary Information." I will hold in confidence and not disclose or, except within the scope of my employment, use any Proprietary Information. However, I shall not be obligated under this paragraph with respect to information I can document is or becomes readily publicly available without restriction through no fault of mine. Upon termination of my employment, I will promptly return to Company all items containing or embodying Proprietary Information (including all copies), except that I may keep my personal copies of (i) my compensation records, (ii) materials distributed to shareholders generally and (iii) this Agreement. I also recognize and agree that I have no expectation of privacy with respect to Company's telecommunications, networking or information processing systems (including, without limitation, stored computer files, email messages and voice messages) and that my activity and any files or messages on or using any of those systems may be monitored at any time without notice.

5.    Until one year after the term of my employment, I will not encourage or solicit any employee or consultant of Company to leave Company for any reason (except for the bona fide firing of Company personnel within the scope of my employment).

6.    I agree that during the term of my employment with Company (whether or not during business hours), I will not engage in any activity that is in any way competitive with the business or demonstrably anticipated business of Company, and I will not assist any other person or organization in competing or in preparing to compete with any business or demonstrably anticipated business of Company.

7.    I agree that this Agreement is not an employment contract for any particular term and that I have the right to resign and Company has the right to terminate my employment at will, at any time, for any or no reason, with or without cause. In addition, this Agreement does not purport to set forth all of the terms and conditions of my employment, and, as an employee of Company, I have obligations to Company which are not set forth in this Agreement. However, the terms of this Agreement govern over any inconsistent terms and can only be changed by a subsequent written agreement signed by the President of Company.

8.    I agree that my obligations under paragraphs 2, 3, 4 and 5 of this Agreement shall continue in effect after termination of my employment, regardless of the reason or reasons for termination, and whether such termination is voluntary or involuntary on my part, and that Company is entitled to communicate my obligations under this Agreement to any future employer or potential employer of mine. My obligations under paragraphs 2, 3 and 4 also shall be binding upon my heirs, executors, assigns, and administrators and shall inure to the benefit of Company, its subsidiaries, successors and assigns.

9.      Any dispute in the meaning, effect or validity of this Agreement shall be resolved in accordance with the laws of the State of California without regard to the conflict of laws provisions thereof.  I further agree that if one or more provisions of this Agreement are held to be illegal or unenforceable under applicable California law, such illegal or unenforceable portion(s) shall be limited or excluded from this Agreement to the minimum extent required so that this Agreement shall otherwise remain in full force and effect and enforceable in accordance with its terms.  This Agreement is fully assignable and transferable by Company, but any purported assignment or transfer by me is void.  I also understand that any breach of this Agreement will cause irreparable harm to Company for which damages would not be an adequate remedy, and, therefore, Company will be entitled to injunctive relief with respect thereto in addition to any other remedies and without any requirement to post bond.

NOTICE: This agreement does not affect any immunity under 18 USC Sections 1833(b) (1) or (2), which read as follows (note that for purposes of this statute only, individuals performing work as contractors or consultants are considered to be employees):

(1)  An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that (A) is made (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

(2)  An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual (A) files any document containing the trade secret under seal; and (B) does not disclose the trade secret, except pursuant to court order.

**I HAVE READ THIS AGREEMENT CAREFULLY AND I UNDERSTAND AND ACCEPT THE OBLIGATIONS WHICH IT IMPOSES UPON ME WITHOUT RESERVATION.  NO PROMISES OR REPRESENTATIONS HAVE BEEN MADE TO ME TO INDUCE ME TO SIGN THIS AGREEMENT.  I SIGN THIS AGREEMENT VOLUNTARILY AND FREELY, IN DUPLICATE, WITH THE UNDERSTANDING THAT THE COMPANY WILL RETAIN ONE COUNTERPART AND THE OTHER COUNTERPART WILL BE RETAINED BY ME.**

Effective Date: _10/14/2019_____

Employee

*Xuan Jiang*
—4718SB94677E452...
Signature

Xuan Jiang
Name (Printed)

Accepted and Agreed to:

**RUN THE WORLD, INC.**

By: _Xiaoyin Qu_____
Name: Xiaoyin Qu
Title: President

## APPENDIX  A

California Labor Code Section 2870.  **Application of provision providing that employee shall assign or offer to assign rights in invention to employer.**

(a)    Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1)    Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

(2)    Result from any work performed by the employee for his employer.

(b)    To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

# EXHIBIT D

---------- Forwarded message ---------
From: **Xuan Jiang** <xuanjiang@runtheworld.today>
Date: Mon, Apr 3, 2023 at 10:17 PM
Subject: Moving On to Build the Future: An Update on Run The World
To: Connie Chan <connie@a16z.com>, pblackwood@a16z.com <pblackwood@a16z.com>


Dear Connie,

I hope this email finds you well. I wanted to reach out to you directly to share some news regarding my role at Run The World.

After much reflection and consideration, I have made the difficult decision to step down as the tech co-founder of Run The World. I am incredibly proud of everything that we have accomplished together, and I have no doubt that Run The World has a bright future ahead of it. However, I have come to the conclusion that it is time for me to move on and pursue a new opportunity in the exciting field of AI-powered virtual hosts and NPCs.

I have always been passionate about the intersection of AI, gaming, and live streaming, and I believe that my new venture has tremendous potential to help gaming and streaming companies create immersive and engaging experiences for their users. I am excited to embark on this new journey, and I am confident that my team and I will be able to make a real impact in this space.

Of course, I am also deeply invested in the success of Run The World and the interests of our investors. While I am disappointed that Run The World may not be able to fully capitalize on its potential without my continued involvement, I remain committed to doing everything in my power to ensure a successful outcome for all parties involved.

I recognize that this news may come as a surprise, and I want to assure you that I have thought long and hard about this decision. At the same time, I want to be clear that I am not interested in selling my shares in Run The World at the current offering price. I believe that Run The World has significant potential and I am confident that, with the right leadership and support, it can continue to thrive and grow.

I want to express my deepest gratitude to you and the entire a16z team for your support and guidance over the years. I am honored to have had the opportunity to work with you and to learn from your wisdom and expertise. I look forward to staying in touch and to supporting Run The World and its new leadership in any way that I can.

Thank you for your understanding, your warmth, and your charisma throughout this transition period. I am grateful for your unwavering support and friendship, and I am excited for what the future holds.

Warm regards,
Xuan Jiang


--
_____

Peter A. Blackwood
Andreessen Horowitz
(m) 650.353.0432
pblackwood@a16z.com



**Xiaoyin Qu**
**CEO, Run The World (Linkedin)**

# EXHIBIT E

# WILSON SONSINI

Wilson Sonsini Goodrich & Rosati
Professional Corporation

650 Page Mill Road
Palo Alto, California 94304-1050

O: 650.493.9300
F: 866.974.7329

ALLISON IVEY TOTH
Email: AIVEY@WSGR.COM
Direct dial: (408) 495-9264

April 18, 2023

**VIA ELECTRONIC MAIL (robert@ottingerlaw.com)**

Robert W. Ottinger
Ottinger Employment Lawyers
535 Mission St., 14th Floor
San Francisco, CA 94105

**Re:    Run The World - Return of Company Property and Xuan Jiang's Confidentiality Obligations to Company**

Dear Mr. Ottinger:

This firm represents Run The World (or the "Company").  This letter addresses two related issues.  First, to request that Xuan Jiang immediately return any and all Company property in her possession, including ceasing to misuse or rendering unavailable any of said property in her custody, possession, or control.   Second, this letter summarizes your client's ongoing obligations to the Company and provides further instructions about how to comply with those obligations.

### A. Your Return of Property Obligation

Your client agreed in Section 4 of the Proprietary Information and Invention Assignment Agreement (the "Confidentiality Agreement") that she signed on October 24, 2019 that she would, immediately upon leaving the company, "promptly return to Company all items containing or embodying Proprietary Information (including any copies), except that I may keep my personal copies of (i) my compensation records, (ii) materials distributed to shareholders generally and (iii) this Agreement."

This means that your client cannot keep any internal files or documents that originated from her employment at Company in her personal possession except for a copy of her offer letter and Confidentiality Agreement and her compensation and benefits records.

**WILSON SONSINI**

Xuan Jiang
April 18, 2023
Page 2

Pursuant to these obligations, I write to demand that your client Xuan Jiang immediately return the Company property which Ms. Jiang has unlawfully retained in her possession. For example, your client has failed to return the Company-issued laptop and laptop charger which were provided for her use as a Run the World employee even though her employment with the Company terminated no later than April 14, 2023. The Company is highly concerned about your client's potential misuse of Company property.

The Company demands that your client return all Company property, including but not limited to all Company accounts and the laptop and charger. Your client must further cease to misuse or render unavailable any Company property (including Company accounts) in her custody possession and control. The Company demands that your client return all physical property to Wilson Sonsini Goodrich & Rosati, ATTN: Allison Ivey Toth, 650 Page Mill Road, Palo Alto CA 94304 by no later than Wednesday, April 19 at 5 pm. All electronic property (including but not limited to Company accounts) must be returned or restored by that time. Should your client fail to do so, the Company reserves all rights to avail itself of all legal options, including litigation and seeking emergency injunctive relief. The Company reserves all rights regarding any prior misuse or harm to Company assets or property.

**B.      Confidentiality Agreement with Company**

Your client's Confidentiality Agreement with the Company outlines, among other things, her obligations to the Company regarding trade secret information. Section 2 of the Confidentiality Agreement outlines the Company's ownership of confidential information:

"Company shall own all right, title and interest (including patent rights, copyrights, trade secret rights, mask work rights, sui generis database rights and all other intellectual property rights of any sort throughout the world) relating to any and all inventions (whether or not patentable) works of authorship, mask works, designs, know-how, ideas and information made or conceived or reduced to practice, in whole or in part, by me during the term of my employment with Company to and only to the fullest extent allowed by California Labor Code Section 2870."

This clause prohibits your client from any unauthorized use or disclosure of any non-public Company information, including technical, business, customer, and financial information. In turn, California's trade secret laws provide for money damages and other serious penalties for unauthorized misuse of confidential information. The same is true of the federal Defend Trade Secrets Act of 2016.

**C.      Complying With Agreements**

It is crucial to not merely recite these agreements, but to understand how to properly comply with them. Your client's contract with Company bars her from using or disclosing – in any way – Company proprietary information. This includes, but is not limited to, nonpublic information about the functionalities and performance of Company products as well as nonpublic Company business plans and product roadmaps.

**WILSON SONSINI**

Xuan Jiang
April 18, 2023
Page 3

Your client cannot use nonpublic Company information for any purpose. For example, your client cannot disclose such information to personnel for a new employer or company, and your client cannot rely on it in any way when performing her job responsibilities at a new employer. Your client also cannot discuss nonpublic Company information during sales meetings with third party customers or other business partners of her new employer. If your client's new co-workers ask about the Company or about details of her work at the Company, your client must explain that she is not able to do so because of her obligations to the Company.

There may be situations where your client is unsure whether an item of information she learned at the Company constitutes nonpublic Company information covered by her Confidentiality Agreement. In such circumstances, please advise your client to not take the risk of violating her agreement without first contacting the Company.

If your client has any questions or concerns as to whether specific items of Company information are nonpublic, please contact me directly to discuss the matter first before she uses or discloses any such information.

The Company takes its contract with your client seriously and expects your client to comply with her obligations to the Company in all her future endeavors. The Company will continue to monitor this situation for any acts of noncompliance with your contract and will take appropriate action to prevent or remedy any such noncompliance.

**D.   Company's Requests**

Based on these obligations, the Company requests that you instruct your client to perform the following tasks and that you provide a written response on behalf of your client no later than Friday, April 21, 2023 regarding the following points:

- Conduct a thorough and complete search of her personal and work-related emails, computers, mobile devices, USBs and other storage devices, hard copy files, cloud accounts, and social media, and identify every email, file, document, record, or other material originating from the Company, if any (excepting her personal compensation, employment, and benefits records).

- To the extent your client possesses such materials, describe the means by which your client retained all such materials (*i.e.*, cloud share, use of other accounts, use of storage devices, etc.).

- Disclose to us in writing all persons and/or entities to whom your client has disclosed any information originating from your client's employment at the Company (or certify in writing that your client has not disclosed any such information to any person or entity).

**WILSON SONSINI**

Xuan Jiang
April 18, 2023
Page 4

- Disclose to us in writing any and all uses your client has made of any information originating from her employment at the Company since her departure (or certify in writing that your client has not used such information, for her own benefit or the benefit of any third party).

- If your client possesses any such information, we request that your client return it by cloud share, USB drive, or other reasonable means of delivery, without disclosing any such information to any new employer, and stand by for instructions regarding deletion or potential cooperation with a vendor to ensure deletion; and

- Confirm that your client understands her confidentiality obligations owed to the Company, and will comply with them.

Please advise your client to not delete or destroy anything relevant to the issues described herein, except as in cooperation with the Company.

I trust you understand the serious nature of this demand, and the consequences should your client fail to comply. Should you have any questions, please email me at aivey@wsgr.com. We reserve all rights.

Sincerely,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

Allison Ivey Toth

cc:

# EXHIBIT F

# WILSON SONSINI

Wilson Sonsini Goodrich & Rosati
Professional Corporation

One Market Plaza
Spear Tower, Suite 3300
San Francisco, California 94105-1126

O: 415.947.2000
F: 866.974.7329

CATHERINE R. LACEY
Internet: CLACEY@WSGR.COM
Direct dial:  415-947-2105

June 1, 2023

<span style="text-decoration: underline">**VIA EMAIL**</span>
Robert W. Ottinger
Ottinger Employment Lawyers
535 Mission Street, 14th Floor
San Francisco, California 94105

**Re:     Ms. Jiang's Departure from and Sabotage of Run The World**

As you know from my colleagues' letters of April 18 and May 24, and my April 27 email, our firm represents Run The World ("RTW") with respect to Xuan Jiang's departure from RTW. RTW demands that Ms. Jiang cease her misconduct towards RTW and compensate RTW for the unlawful harm she has already done to RTW and its customers.

As Ms. Jiang well knows, in July 2019, she entered a Restricted Stock Purchase Agreement with RTW to purchase founders' shares of RTW ("Purchase Agreement").  Under the Purchase Agreement, in exchange for the shares, Ms. Jiang "transfer[ed] and assign[ed] to the Company (i) the business plan of the Company (the 'Business Plan') and (ii) any and all right, title and interest [Ms. Jiang] has in the Company's business and any Intellectual Property (as defined below) related to the Company's business, as currently conducted and as contemplated to be conducted pursuant to the Business Plan or otherwise."  "Intellectual Property" was broadly defined to include, *inter alia*, "domain names, web addresses and web sites, and all rights therein and thereto."  Ms. Jiang also agreed "to take all actions reasonably requested by the Company to assist the Company in effecting the foregoing transfer and in establishing, perfecting, defending, enforcing and protecting the Company's rights in any of the above transferred items."  Thus, with the execution of the Purchase Agreement, Ms. Jiang both (1) took on fiduciary duties to RTW and (2) expressly agreed that all domains related to RTW's business belonged to RTW.

Ms. Jiang reaffirmed these duties and agreement after registering the domains "rtw.team" and "rtw.today" for RTW (collectively, the "RTW Domains") in her role as technical lead of the company.  For example, Ms. Jiang has acknowledged she owed duties as a fiduciary to RTW in subsequent emails.  In addition, on October 4, 2019, Ms. Jiang signed a letter agreement reaffirming that she assigned to RTW "any and all right, title and interest [she] had in [RTW]'s business and any Intellectual Property related to [RTW]'s business, as currently conducted and as contemplated to be conducted pursuant to the Business Plan and otherwise" (the "Letter Agreement").  On October 14, 2019, in connection with her formal employment agreement with RTW, Ms. Jiang also signed the Confidentiality Agreement discussed at length

**WILSON SONSINI**

Robert Ottinger
[Click and Type Date]
Page 2

in our April 18 letter, in which she agreed that RTW owned all intellectual property "made or conceived or reduced to practice, in whole or in part, by" Ms. Jiang during her employment with RTW, and in which she agreed that after termination of her employment she would retain only "(i) [her] compensation records, (ii) materials distributed to shareholders generally and (iii) [the Confidentiality] Agreement."

Ms. Jiang's conduct during her employment further confirmed she was aware that the domains belonged to RTW—and were integral to RTW's business. Ms. Jiang associated her RTW email address with the GoDaddy account used to register the RTW Domains, and she used an RTW credit card to pay fees for the account. Ms. Jiang also listed, in an onboarding guide for new RTW engineers, "rtw.team" as the "keyword" for certain tools as well as various addresses incorporating the "rtw.team" domain. Ms. Jiang similarly referred to addresses incorporating the "rtw.team" domain in numerous work communications with RTW engineers. Moreover, when the CEO of RTW, Xiaoyin Qu, mentioned transferring the RTW Domains to a potential acquiror of RTW in an email, Ms. Jiang agreed to assist. Ms. Jiang knew the RTW Domains were owned by and critical to RTW.

Despite this knowledge, her fiduciary duties to RTW, and her agreement that the RTW Domains belonged to RTW, Ms. Jiang chose to use her practical control of the RTW Domains to sabotage the company. As set out in our May 24, 2023 letter, Ms. Jiang clearly and unilaterally resigned from RTW on April 3, 2023. She vehemently protested, however, when RTW accepted her resignation and terminated her employment. Shortly after Ms. Jiang was terminated and her access to her RTW email account was terminated—but before she was removed from RTW's board of directors—Ms. Jiang apparently logged into the GoDaddy account and deleted, canceled, or otherwise rendered inoperable the RTW Domains so that RTW's customer-facing website and products as well as internal tools would be unusable. RTW would later receive an email at Ms. Jiang's former RTW email account from GoDaddy stating that the RTW Domains had been deleted or canceled.

As a result of Ms. Jiang's actions, RTW's primary customer-facing website and products were unusable for more than a week. In the meantime, more than 700,000 user accounts were inaccessible. RTW customers suffered harm, as they were suddenly unable to host events— including paid events—on the RTW platform, resulting in immediate lost revenues and reputational harm with their users and customers. This has, in turn, damaged RTW's reputation with its customers. RTW has also suffered immediate damages including at least expenditures on acquiring a new domain and remapping the website, products, and tools to that domain; customer refunds and lost revenue; a disrupted acquisition; and investigatory, compliance, and legal costs around Ms. Jiang's sabotage. These immediate damages are believed to be well over $1 million with overall damages estimated to be much higher.

Moreover, as you know based on prior correspondence, Ms. Jiang has refused to provide access to the GoDaddy account to allow RTW to recover the RTW Domains. In addition, she apparently wiped her RTW laptop of RTW information in contravention of her contractual

**WILSON SONSINI**

Robert Ottinger
[Click and Type Date]
Page 3

obligations to RTW, RTW's express instructions not to, and her preservation obligations.[1]  Ms. Jiang apparently also lost, destroyed, or refuses to return other important RTW documents that were entrusted to her as part of her employment, including documents relating to RTW's trademarks and corporate registration.

Based on the foregoing, RTW has claims against Ms. Jiang for at least violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030; violation of the Comprehensive Computer Data Access and Fraud Act, California Penal Code § 502; breach of contract; and breach of fiduciary duty.  RTW is prepared to pursue legal action asserting these and any other claims it may have against Ms. Jiang, and RTW reserves the right to do so.  However, RTW is willing to discuss alternatives that include Ms. Jiang (1) returning all RTW property that remains in her possession, and (2) compensating RTW for the harm already caused, including for lost RTW property she can no longer return.

Please contact us within seven days (7) days to discuss this matter.  Otherwise, RTW reserves its right to pursue legal action.

Sincerely,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

*/s/ Catherine R. Lacey*

Catherine R. Lacey

cc:     paraskevi@ottingerlaw.com
        iqra@ottingerlaw.com
        aivey@wsgr.com
        jlonergan@wsgr.com
        jjaffe@wsgr.com

---

[1] Your firm's May 17 letter on Ms. Jiang's behalf purporting to admonish **RTW** to "retain and not alter or destroy any and all documents, including documents in electronic and draft form, relating to this matter" is not well taken given Ms. Jiang's conduct.