UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RUN THE WORLD INC.,<br><br>      Plaintiff,<br><br>   v.<br><br>XUAN JIANG,<br><br>      Defendant. | Case No. 23-cv-03130-AMO<br><br>**ORDER GRANTING MOTION TO DISMISS**<br><br>Re: Dkt. No. 120 |

This is a Computer Fraud and Abuse Act ("CFAA") case. Defendant Xuan Jiang's motion to dismiss for lack of subject matter jurisdiction was heard before this Court on March 13, 2025.[1] Having read the papers filed by the parties and carefully considered their arguments therein and those made at the hearing, as well as the relevant legal authority, the Court hereby **GRANTS** Jiang's motion, for the following reasons.

I.   **BACKGROUND**[2]

Plaintiff Run the World, Inc. ("RTW") hosts virtual social gatherings, webinars, and conferences. Compl. (ECF 1) ¶ 2. Defendant Jiang was the co-founder and technical lead of RTW. Compl. ¶¶ 8-9.

---

[1] The Court also heard argument on former Counterclaim Defendants Run The World, Inc.'s and Xiaoyin Qu's pending Motions for Attorney's Fees. *See* ECF 122, ECF 124. The Court will issue a separate order on those Motions.

[2] The Court accepts Plaintiff Run the World's well-pleaded allegations in the complaint as true and construes the pleadings in the light most favorable to it. *See Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008) (citation omitted).

**A.     Factual Background**

On or about July 10, 2019, Jiang and RTW co-founder Xiaoyin Qu entered into a Restricted Stock Purchase Agreement (Purchase Agreement) with the company to purchase founders' shares. Compl. (ECF 1) at ¶ 8, Ex. A. In the Agreement, Jiang, as part of her consideration for the shares in RTW, "transfer[ed] and assign[ed] to the Company [RTW] . . . any and all right, title and interest the Purchaser [Jiang] has in the Company's business and any Intellectual Property (as defined below) related to the Company's business, as currently conducted and as contemplated to be conducted pursuant to the Business Plan or otherwise." Compl. ¶ 8 (quoting Ex. A at 1, § 1). The Purchase Agreement defined "Intellectual Property" to include, inter alia, "domain names, web addresses and web sites, and all rights therein and thereto." Compl. ¶ 8 (quoting Ex. A).

Jiang signed a Letter Agreement on or about October 4, 2019, reaffirming that in the July 10, 2019 Purchase Agreement she had assigned to RTW "any and all right, title and interest [she] had in [RTW]'s business and any Intellectual Property related to [RTW]'s business, as currently conducted and as contemplated to be conducted pursuant to the Business Plan and otherwise." Compl. ¶ 17 (quoting Ex. B). On or about October 14, 2019, Jiang also signed a Proprietary Information and Inventions Agreement (the "Confidentiality Agreement") through which she agreed that RTW "shall own all right, title and interest (including . . . sui generis database rights and all other intellectual property rights of any sort throughout the world) . . . designs, know-how, ideas and information made or conceived or reduced to practice, in whole or in part, by [Jiang] during the term of [her] employment with" RTW. Compl. ¶ 18 (quoting Ex. C at 1, § 2). "Jiang was responsible for obtaining online domains for RTW. Domains are used to identify a location on the Internet, such as the web address for a website. RTW required domains for the web address for its customer facing website, as well as for Internet locations used by both its customer-facing products and its internal developer and database tools." Compl. ¶ 11.

In or about September 2019 – after signing the Purchase Agreement but before signing the Letter Agreement or the Confidentiality Agreement – Jiang registered the domain "rtw.team" for RTW with the domain registrar GoDaddy. Compl. ¶ 12. "The rtw.team domain would be used in

2

connection with RTW's customer-facing website, https://www.runtheworld.today/; for addresses used by RTW's customer-facing products; and for addresses used by RTW internally for developer and database tools. Jiang also obtained for RTW the domain 'rtw.today' (collectively with 'rtw.team,' the 'RTW Domains')." *Id.* ¶ 12. Jiang used a company credit card to pay bills for the GoDaddy account used to set up and maintain the RTW Domains, and she registered her RTW-issued email account, xuanjiang@runtheworld.today, as an email for the GoDaddy account that controlled the domains. Compl. ¶14. "The GoDaddy account belonged to RTW at least from the registration of the RTW Domains, for which 'all rights therein and thereto' had been assigned to RTW." *Id.*

The RTW Domains were integral to RTW's web-based business. RTW alleges,

> The RTW Domains, and the websites, products, and tools that rely on the domains to function, are valuable to RTW. RTW is a web-based business. RTW clients hold virtual events through the customer-facing website. When the domains used for website addresses are inaccessible, the website and customer-facing products cannot work. Further, RTW's internal developer and database tools use addresses that incorporate internet domains, and they too do not function if they cannot connect to the appropriate domain. RTW's entire business depended on access to the RTW Domains.

Compl. ¶ 15.

Jiang resigned from her position with the company on April 3, 2023, by sending an email to RTW's funding company. Compl. ¶¶ 23-24; *see also* Second Amended Counterclaims (ECF 78, "SACC") ¶ 207 (quoting 4/3/2023 "resignation email"). On April 12, 2023, at 3:21 p.m., RTW's counsel sent an email to Jiang accepting her resignation. Compl. ¶ 25; *see also* SACC ¶ 195 (acknowledging that Jiang's separation from the company). Jiang attempted to retract her resignation at 3:58 p.m. the same day. Compl. ¶ 25. The following day, on April 13, 2024, RTW experienced an outage of its customer-facing website, products, and internal coding and database tools. Compl. ¶¶ 27-28. Qu, RTW's CEO, remedied the outage by accessing the GoDaddy account previously registered to Jiang, xuanjiang@runtheworld.today. Compl. ¶ 29. Qu renewed the RTW Domains, and RTW engineers reconfigured the web settings and fixed the issue. *Id.* Later that day, RTW suffered another outage of its customer-facing website, products, and internal coding and database tools. Compl. ¶ 30. RTW received numerous customer messages regarding

the website and products again being inaccessible. Compl. ¶ 30. Still on April 14, 2023, "RTW received an email at xuanjiang@runtheworld.today, the email account previously assigned to Jiang, from the GoDaddy website hosting service indicating that both RTW Domains had been deleted or cancelled" despite no one from the company undertook such action. Compl. ¶ 32.

RTW alleges Jiang caused these outages by accessing the account after her separation from the company. Compl. ¶¶ 27-32. RTW alleges that Jiang's unauthorized access of the servers that hosted the RTW Domains, and subsequent deletion or cancellation of those domains, resulted in actual damage to the domains on which RTW's business relied, as well as to RTW's customer-facing website and products. Compl. ¶¶ 47-49. As a result of Jiang's actions, "RTW had to acquire another domain and re-map its products and internal tools using the new domain, which [took] considerable time and expense. The primary customer-facing website and customer services were down for more than a week. During that time, more than 700,000 RTW user accounts were inaccessible, causing harm to RTW's customers and damaging RTW's reputation, trust, and relationship with its customers." Compl. ¶ 33. RTW also received complaints from numerous customers. Compl. ¶ 34.

### B.     Procedural History

On June 23, 2024, Plaintiff RTW filed its original Complaint in this action in the Northern District Court of California, against Defendant Jiang, alleging six causes of action:

- (1) Violation of Computer Fraud and Abuse Act ("CFAA") (18 U.S.C. § 1030, et seq.);
- (2) Violation of California Comprehensive Computer Data Access and Fraud Act (Cal. Pen. Code §§ 502 et seq.);
- (3) Breach of Contract;
- (4) Breach of Fiduciary Duty;
- (5) Trespass to Chattels; and
- (6) Conversion of Property.

Only the first cause of action for violation of the CFAA purports to arise under federal law. All remaining causes of action are alleged to arise under California state law. RTW's Complaint states that "This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331,

4

1   as it arises under the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 et seq.," and that the
2   Court has supplemental jurisdiction over the remaining state law claims under 28 U.S.C.
3   § 1367(a).  Compl. ¶¶ 4-5.
4         On August 17, 2023, Jiang filed her Answer, Defenses, and Verified Counterclaims against
5   RTW, Xiaoyin Qu, Connie Chan, AH Capital Management, LLC, and 5Totuch Solutions, Inc.
6   ECF 16.  On January 3, 2024, Jiang filed her Notice of Voluntary Dismissal of Counterclaim-
7   Defendant 5Touch Solutions, Inc. dba Eventmobi.  ECF 45.  On February 26, 2024, Jiang filed her
8   Second Amended Counterclaims ("SACC," ECF 78), alleging 19 counterclaims against the
9   Counterclaim Defendants, including a federal cause of action for violation of CFAA against
10  Counterclaim Defendant Qu with the remaining causes of action arising under California state law.
11  ECF 78.
12        On August 1, 2024, the Court granted Counterclaim Defendants' motions to stay discovery
13  and the Court denied without prejudice RTW's motion for attorney fees.  Minute Entry, ECF 113.
14  On August 2, 2024, the Court issued an Order (ECF 114, "Order") granting Counterclaim
15  Defendants' motions to dismiss Jiang's SACC (ECF 80, ECF 82, and ECF 85).

## II.     DISCUSSION

17        Jiang now moves to dismiss RTW's Complaint on the basis that the same legal reasoning
18  that resulted in dismissal of her Counterclaims should apply with equal force to RTW's pleading.
19  *See* Mot. (ECF 120) at 1.  Jiang presents her motion as one arising under Rule 12(b)(1) for lack of
20  subject matter jurisdiction – because RTW fails to state a claim for violation of the CFAA, she
21  reasons, the Court lacks federal question subject matter jurisdiction over RTW's claims.  Jiang
22  only challenges the sufficiency of RTW's CFAA pleading and asks the Court to decline to

5

1  exercise supplemental jurisdiction over the state law claims in the same way the Court dismissed
2  her counterclaims.[3]

### A. Legal Standard

Under Rule 12(b)(1), dismissal is appropriate if the court lacks subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). "A Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction . . . may be made at any time." *In re Apple iPhone Antitrust Litig.*, 846 F.3d 313, 319 (9th Cir. 2017) (citing Fed. R. Civ. P. 12(b)(1) and 12(h)(3)). An attack on subject matter jurisdiction "may be facial or factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). A facial attack asserts that "the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction[,]" while a factual attack "disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Id.* at 1039. Where the attack is facial, the court determines whether the allegations contained in the complaint are sufficient on their face to invoke federal jurisdiction, accepting all material allegations in the complaint as true and construing them in favor of the party asserting jurisdiction. *Warth v. Seldin*, 422 U.S. 490, 501 (1975). In a factual challenge to subject matter jurisdiction under Rule 12(b)(1), "the court need not presume the truthfulness of the plaintiff's allegations," and the court may consider evidence outside the operative complaint in resolving whether it has jurisdiction without converting the motion into a motion for summary judgment. *Safe Air for Everyone*, 373 F.3d at 1039; *see also Young v. United States*, 769 F.3d 1047, 1052 (9th Cir. 2014) (quotations and citation omitted). "Once the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of

---

[3] While motions to dismiss for lack of subject matter jurisdiction may be raised at any time, Rule 12(b) specifies that a motion asserting the defense of failure to state a claim "must be made before pleading." Jiang's motion, though framed as a motion challenging the Court's subject matter jurisdiction, constitutes a blatant attempt to circumvent Rule 12(b)'s strictures by seeking dismissal for failure to state a claim under Rule 12(b)(6) after she already answered. *See* Answer (ECF 16); SACC (ECF 78). The Court elects to consider the merits of Jiang's motion despite the gamesmanship, particularly in light of RTW's failure to oppose on this basis. *See In re Apple Iphone Antitrust Litig.*, 846 F.3d 313, 318 (9th Cir. 2017); *see also* Fed. R. Civ. P. 1. The Court strongly discourages such efforts to circumvent the Federal Rules in the future and the parties should expect the Court will likely strike improper motions sua sponte.

6

establishing subject matter jurisdiction." *Savage v. Glendale Union High Sch., Dist. No. 205, Maricopa Cnty.*, 343 F.3d 1036, 1040 n.2 (9th Cir. 2003).

### B. Analysis

#### 1. Damage to a "Protected Computer"

"The CFFA was enacted to prevent intentional intrusion onto someone else's computer – specifically, computer hacking" and "is best understood as an anti-intrusion statute and not as a misappropriation statute." *HiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1196 (9th Cir. 2022) (internal quotations and citations omitted). It prohibits, among other things, intentionally accessing a computer "without authorization" or by "exceed[ing] authorized access" to obtain information from a protected computer. 18 U.S.C. § 1030(a)(2)(C). The phrase "without authorization" means without permission. *See HiQ Labs*, 31 F.4th at 1195. The phrase "exceeds authorized access" means accessing "a computer with authorization and [using] such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter." 18 U.S.C. § 1030(e)(6). "[L]iability under both clauses stems from a gates-up-or-down inquiry – one either can or cannot access a computer system, and one either can or cannot access certain areas within the system." *VanBuren v. United States*, 593 U.S. 374, 390 (2021). It "does not cover those who . . . have improper motives for obtaining information that is otherwise available to them." *Id.* at 378.

The CFAA includes the following relevant definitions:

> (e) As used in this section –
> (1) the term "computer" means an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device, but such term does not include an automated typewriter or typesetter, a portable hand held calculator, or other similar device;
> (2) the term "protected computer" means a computer –
> . . .

> (B) which is used in or affecting interstate or foreign commerce or communication, including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States; . . .

18 U.S.C. § 1030(e). The damage asserted in support of a CFAA claim must be "harm to computers or networks, not economic harm due to the commercial value of the data itself." *NetApp, Inc. v. Nimble Storage, Inc.*, 41 F. Supp. 3d 816, 834 (N.D. Cal. 2014) (collecting cases).

In the Court's order granting dismissal of Jiang's counterclaim for violation of the CFAA, it analyzed Jiang's failure to allege harm to a computer and noted she only alleged impairment of access to her online account. *See* Order (ECF 114) at 6. The Court found that Jiang claimed

> only damages based on "Jiang's own ingenuity, time, money, and resources in creating, developing, and maintaining the software and developer tools hosted on her personal GoDaddy account, which Jiang routinely used to earn a living as a software developer." SACC ¶ 174. This does not constitute harm to a computer, particularly where Jiang cannot specify any lasting impact to the computer code. Moreover, Jiang's counsel stated at the hearing that any impairment to the availability of data lasted little more than a day. Jiang cannot establish harm to a computer on these facts. *Cf. NovelPoster v. Javitch Canfield Grp.*, 140 F. Supp. 3d 954, 961-62 (N.D. Cal. 2014) (finding seven-month interruption of service to constitute damage under CFAA).

Order at 6. Jiang focuses much of her attention on this portion of the Court's order, arguing that the same defect that the Court relied upon in dismissing her CFAA claim exists in RTW's pleading. This myopic interpretation of the Court's order proves unhelpful. In the Order, the Court noted that Jiang failed to allege lasting impact to "computer code" because that was the harm she alleged – that her "stored code bases . . . were compromised" and settings were changed. SACC (ECF 78) ¶¶ 38, 173. To the extent Jiang reads from the Court's order that "lasting impact to computer code" is specifically necessary to plead a CFAA claim, the Court here clarifies that it did not set forth a different harm standard than established in earlier precedent. *See, e.g.*, *NetApp, Inc.*, 41 F. Supp. 3d at 834.

Turning to the sufficiency of RTW's pleading here, it alleges that Jiang deleted, cancelled, or otherwise rendered inoperable the RTW Domains and, perhaps even more significantly, that this had the effect of disabling RTW's "customer-facing website, customer-facing products, and

8

1    internal tools." Compl. ¶ 48. Indeed, RTW charges that Jiang effectively shut-down the
2    company's web-based business for more than a week. Compl. ¶ 33. This contrasts significantly
3    with Jiang's unsuccessful counterclaim, which merely contended that she was prevented from
4    accessing data within a GoDaddy account for approximately one day.
5           Jiang additionally avers that RTW fails to allege technological harm to a protected
6    computer on the basis that RTW fails to allege anything more than a temporary "outage." *See,*
7    *e.g.*, Mot. at 8 ("RTW's Complaint merely pleads a brief 'outage' of a single GoDaddy domain as
8    the only basis for alleging CFAA harm, and it certainly has not alleged harm close to or beyond
9    'little more than a day.' ") (quoting Order at 6). In so arguing, Jiang improperly centers her
10   attention on a single portion of the Complaint (¶ 29) and a single passage in the Court's order.
11   RTW alleges more than a mere "outage" of its access to an online account: it alleges that Jiang's
12   sabotage "left 700,000 RTW user accounts inaccessible for over a week." *See* Compl. ¶¶ 23-33
13   ("On information and belief, the domains were deleted or cancelled by or at the behest of Ms.
14   Jiang for the purpose of sabotaging RTW's operations. . . . The primary customer-facing website
15   and customer services were down for more than a week."). Jiang's failure to acknowledge these
16   allegations does not erase them from the Complaint.
17          It bears noting that the disablement of RTW's customer-facing website, other web-based
18   services, and internal tools by deleting or canceling the RTW Domains involves damage to a
19   "protected computer," regardless of whether that website is hosted on a server owned by third
20   party GoDaddy. *See hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1195 (9th Cir. 2022)
21   (holding that servers constitute "protected computers"); *see also* 18 U.S.C. § 1030(e)(1). It is
22   irrelevant whether RTW's website was hosted on one or more servers owned and maintained by
23   others. *Skyhop Techs., Inc. v. Narra*, 58 F.4th 1211, 1227 (11th Cir. 2023) ("It makes no
24   difference that SkyHop does not own the servers (Amazon does)").
25          Therefore, and in sum, RTW sufficiently alleges that Jiang committed damage to a
26   protected computer.

9

## 2. Access "Without Authorization"

Jiang additionally challenges that RTW has not adequately pleaded she intentionally accessed one or more protected computers without authorization. She contends that RTW did not affirmatively rescind her right to access RTW's computers, and thus " 'any existing authorization / permission remains.' " Mot. at 10 (quoting *Domain Name Comm'n Ltd. v. DomainTools, LLC*, 449 F. Supp. 3d 1024, 1027 (W.D. Wash. 2020)).

In the CFAA context, the Ninth Circuit has applied the ordinary, common meaning of "authorization," concluding that one is authorized to access a computer when the owner of the computer gives permission to use it. *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1132-33 (9th Cir. 2009); *see also hiQ Labs*, 938 F.3d at 999 ("We have held in another context that the phrase 'without authorization' is a non-technical term that, given its plain and ordinary meaning, means accessing a protected computer without permission.") (internal quotation marks and citation omitted). A defendant runs afoul of the "without authorization" provisions of the CFAA when they have "no permission to access a computer or when such permission has been revoked explicitly. Once permission has been revoked, technological gamesmanship or enlisting of a third party to aid in access will not excuse liability." *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1067 (9th Cir. 2016). In the context of employment, "whether access is authorized or unauthorized 'depends on actions taken by the employer.' " *Domain Name*, 449 F. Supp. 3d at 1027 (quoting *Brekka*, 581 F.3d at 1134-35). Indeed, the Ninth Circuit has explained that where a former employee accesses their former employer's information on the company's third-party-hosted database website after leaving the company, the former employee has "accessed a protected computer 'without authorization' for purposes of the CFAA." *Brekka*, 581 F.3d at 1136.

Here, Jiang avers that she was authorized to access the RTW Domains because they belonged to her, not RTW; and because they belonged to her, RTW's acceptance of her resignation did not affirmatively rescind her access. Mot. (ECF 120) at 11-12. Not so. The RTW Domains belonged to RTW pursuant to Jiang's employment agreements. The Purchase Agreement, Letter Agreement, and Confidentiality Agreement each establish that Jiang assigned the RTW Domains to RTW, and that they were RTW's property at the time she accessed and

deleted or canceled them. *See* Compl., Exs. A-C; *see also* Willard Decl., Exs. A-C (independently establishing admissibility of Exs. A-C to the Complaint). In the Purchase Agreement, Jiang, as part of her consideration for shares in RTW, "transfer[ed] and assign[ed] to [RTW] . . . any and all right, title and interest [Jiang had] in the Company's business and any Intellectual Property (as defined below) related to the Company's business, as currently conducted and as contemplated to be conducted pursuant to the Business Plan or otherwise." Compl., Ex. A; Willard Decl., Ex. A. The Purchase Agreement defined "Intellectual Property" to include "domain names, web addresses and web sites, and all rights therein and thereto." *Id.* at 1, § 1. The October 4, 2019 Letter Agreement reaffirmed Jiang's assignment to RTW "any and all right, title and interest [she] had in [RTW]'s business and any Intellectual Property related to [RTW]'s business, as currently conducted and as contemplated to be conducted pursuant to the Business Plan and otherwise." Compl., Ex. B; Willard Decl., Ex. B. Jiang also signed an October 14, 2019 Confidentiality Agreement, through which she agreed that RTW "shall own all right, title and interest (including . . . sui generis database rights and all other intellectual property rights of any sort throughout the world) relating to any and all . . . designs, know-how, ideas and information made or conceived or reduced to practice, in whole or in part, by [Jiang] during the term of [her] employment with [RTW] . . ." Compl., Ex. C at 1, § 2; Willard Decl., Ex. C. Though Jiang repeats throughout her papers that the rtw.team domain remained her personal property (*see, e.g.*, Reply at 3), her employment agreements show she is simply incorrect. She assigned the domain, among the other intellectual property she produced in the course of her employment, to RTW through these several agreements.[4]

At the time Jiang interfered with the RTW Domains, crashed RTW's customer-facing website and services, and effectively shut-down the business, she had already been advised on April 12, 2023, that her resignation had been accepted. Compl. ¶ 25 ("Subsequently, on or about

---

[4] The Court properly reaches the conclusion that the RTW Domains belonged to RTW, not Jiang, under either a facial or factual challenge, as the same evidence is both incorporated into the Complaint, as Exhibits thereto, and proffered by RTW as admissible evidence as Exhibits to the Declaration of RTW's board member, Paul Willard. *See* Compl, Exs. A-C; Willard Decl., Exs. A-C (ECF 126).

April 12, 2023, at approximately 3:21 PM Pacific time, RTW's counsel sent an email to Jiang confirming acceptance of her resignation and the separation of Jiang from RTW."). She was no longer an employee of RTW and was accordingly no longer authorized to access the company's domains. In a more blatant instance of improper access following Jiang's separation from RTW, the company alleges that Jiang accessed, then deleted or cancelled the RTW Domains on GoDaddy after her removal from the board of RTW on April 14, 2023. Compl. ¶¶ 31-32. A former employee or board member, like Jiang, necessarily lacks authorization to access her former company's protected computers. *Brekka*, 581 F.3d at 1136 ("There is no dispute that if Brekka accessed LVRC's information on the [company's third-party-hosted database] after he left the company in September 2003, Brekka would have accessed a protected computer 'without authorization' for purposes of the CFAA."). Taking RTW's allegations of improper access as true, the Court finds that Jiang accessed the GoDaddy accounts/servers with authorization prior to the acceptance of her resignation on April 12, 2023, and without authorization after that date.

### 3. Loss

A civil claim under the CFAA requires "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value." 18 U.S.C. § 1030(c)(4)(A)(i)(I); *Andrews v. Sirius XM Radio Inc.*, 932 F.3d 1253, 1262 (9th Cir. 2019). The CFAA "defines 'loss' as 'any reasonable cost to any victim, including the cost of responding to an offense, conducting a damages assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service.'" *Andrews*, 932 F.3d at 1262 (quoting 18 U.S.C. § 1030(e)(11)). A recovery in a civil action based on an alleged violation of subsection (c)(4)(A)(i)(I) – the subsection at issue in this case – is expressly limited to "economic damages." 18 U.S.C. § 1030(g). As stated in *Brodsky v. Apple Inc.*:

> Plaintiffs have failed to plead damages under the CFAA. Although Plaintiffs make the conclusory allegation that Plaintiffs suffered "economic loss with an aggregated value of at least $5,000 during a one-year period," Plaintiffs allege no facts to support that conclusion. [ ] Plaintiffs do not allege the dollar value of any alleged damages in the FAC, let alone dollar values that could amount to $5,000.

12

*Brodsky*, 19-CV-00712, 2019 WL 4141936, at *8 (N.D. Cal. Aug. 30, 2019).

In the Court's order granting dismissal of Jiang's counterclaim for violation of the CFAA, it stated that Jiang failed to allege loss of at least $5,000 because she only alleged that her developer tools and stored code bases had been compromised. *See* Order at 6. Again, Jiang aims to fit the square peg of the Court's reasoning into the round hole of RTW's pleading – she asserts that RTW's allegations fail on the same grounds that her allegations failed.

RTW alleges that soon after Jiang resigned and faced removal from the RTW Board, its websites began experiencing outages that left 700,000 RTW user accounts inaccessible for over a week. Compl. ¶¶ 23-33. These outages were linked to Jiang's deletion or cancellation of the internal domains, which were maintained by third-party domain registrar GoDaddy. Compl. ¶¶ 12, 28-32; *see also* Answer ¶ 32 (acknowledging Jiang's conduct). RTW contends that Jiang's conduct prevented its "customers from using its website and products during the outages, harmed RTW's customer trust and relationships, and required RTW to expend time and money on . . . restoring service." Compl. ¶ 49. Arising from this interference, RTW argues that it sufficiently alleges "loss" within the meaning of Title 18 U.S.C. § 1030(e)(11) in the form of the expenditure of "significant time and money reconnecting RTW's websites and products with its users," and loss of goodwill due to the fact that "RTW's relationships with its customers have been harmed by Defendant's unauthorized access[.]" Compl. ¶¶ 50-51. RTW further asserts, "Defendant's unauthorized access described herein has cost Plaintiff well in excess of $5,000.00 in economic damages." Compl. ¶ 52. Though RTW is entitled to a favorable inference that it suffered loss, it fails to provide necessary factual support to support the dollar value of its alleged loss. RTW's pleading fails on this basis, but RTW clarified at the hearing that it has specific factual allegations that it would add to bolster the claim for damages above $5,000. The Court accordingly finds that RTW fails to sufficiently allege loss sufficient to support its CFAA claim, but that this defect could be remedied upon amendment.

### III. CONCLUSION

For the foregoing reasons, particularly RTW's failure to sufficiently allege loss under the CFAA, the Court **GRANTS** Jiang's motion to dismiss with leave to amend. RTW's amended

13

complaint shall be filed by no later than April 25, 2025.  No additional parties or claims may be added without leave of Court or stipulation of Defendant.

**IT IS SO ORDERED.**

Dated: March 28, 2025

_____
**ARACELI MARTÍNEZ-OLGUÍN**
**United States District Judge**